AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

_____ **DISTRICT OF** _____
**MASSACHUSETTS**

UNITED STATES OF AMERICA

**V.**

LIO CARRION SANTIAGO, PEDRO ALBERTO
RANDA, REYNALDO RIVERA, JOSE RODRIGUEZ,
IRIQUE AGOSTO, JOSE TORRADO, CARLOS SANCHEZ,
IS R. SANCHEZ, EDWIN TORREZ, ZULEIMA REYES and
NTIAGO ARROYO

## CRIMINAL COMPLAINT

CASE NUMBER: $2004 M 0500 RBC$

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief.  In or about December 2003 and continuing ____  in  MIDDLESEX AND WORCESTER  county, in the
to in or about October 2004

_____  District of  MASSACHUSETTS  defendant(s) did, (Track Statutory Language of Offense)

CONSPIRE TO POSSESS WITH INTENT TO DISTRIBUTE AND DISTRIBUTE A MIXTURE OR SUBSTANCE CONTAINING
A DETECTABLE AMOUNT OF HEROIN, A SCHEDULE 1 CONTROLLED SUBSTANCE

lation of Title____ 21 ____ United States Code, Section(s) _____ 846, 841(a)(1) _____.

further state that I am a(n)_____ SPECIAL AGENT, DEA ____ and that this complaint is based on the following
Official Title

acts:

SEE ATTACHED AFFIDAVIT OF SPECIAL AGENT CALICE COUCHMAN

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

Signature of Complainant

Special Agent Calice Couchman

sworn to before me and subscribed in my presence,

14-2004    at 6:55 pm    at    BOSTON, MASSACHUSETTS
City and State

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE
Name & Title of Judicial Officer    Signature of Judicial Officer

his form was electronically produced by Elite Federal Forms, Inc.

## AFFIDAVIT OF SPECIAL AGENT CALICE COUCHMAN

I, Calice Couchman, being duly sworn, do hereby depose and state under oath as follows:

### I. Introduction

1.    I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA") and have been so employed for over 19 years. As a Special Agent of the DEA, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations and to make arrests and seizures for offenses enumerated in 18 U.S.C. § 2516.

2.    I am currently assigned to the Boston Field Division. I have participated in the arrest of over 200 individuals for narcotics violations. I have participated in undercover investigations involving the purchase of controlled substances, executed search warrants for controlled substances, executed seizure warrants for properties involved in controlled substance violations, and conducted surveillance in narcotics investigations which have allowed me to become familiar with the techniques utilized by drug dealers and traffickers to conceal their illicit narcotics, their criminal activities involving narcotics and materials related thereto in an effort to evade detection by law enforcement officials. I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations.

3.    Since becoming a Special Agent I have attended numerous courses and conferences relating to money laundering and asset removal matters. I have been assigned to and participated in approximately forty (40) financial investigations which included civil and criminal aspects of Titles 18 and 21 as they relate to criminal and civil asset seizure and forfeiture and money laundering. I have written, or assisted in the preparation of, over one hundred (100) seizure/forfeiture warrants and affidavits in support of forfeitures.

4.    Specifically, I am familiar with the manner in which narcotics traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to

1

transport and distribute narcotics and the proceeds of narcotics trafficking. I also am familiar with the manner in which narcotics traffickers use telephones, coded or slang-filled telephone conversations, pagers, coded pager messages, and other means to facilitate their illegal activities. I am also familiar with the practice of many drug traffickers in not maintaining assets in their own names, but in the names of family members or close associates.

### This Case

5.    I have personally participated in the investigation of the subjects identified in this Affidavit since in or about May 2003. I am familiar with the facts and circumstances of this investigation from oral and written reports made to me by other Agents of the DEA, other federal, state and local law enforcement agencies, oral and written reports of conversations and meetings with numerous confidential sources, a review of consensually recorded conversations, and a review of conversations intercepted pursuant to court-ordered wiretaps as well as my own personal participation in the investigation which includes surveillance and independent investigation.

6.    I submit this affidavit in support of an application for a criminal complaint against **JULIO CARRION SANTIAGO, a/k/a "MACHO," PEDRO ALBERTO MIRANDA, a/k/a "TAVO," REYNALDO RIVERA, a/k/a "REY", JOSE RODRIGUEZ, ENRIQUE AGOSTO, JOSE TORRADO, CARLOS SANCHEZ, a/k/a "CARLITOS," LUIS R. SANCHEZ, a/k/a "PITO," EDWIN TORREZ, a/k/a "COQUI, a/k/a TIM," ZULEIMA REYES, a/k/a "LINDA," and SANTIAGO ARROYO** (collectively, "Target Subjects") charging each of them with conspiracy to possess with intent to distribute and to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B) and 846.

7.    I also submit this affidavit in support of an application for the issuance of search warrants to be executed at the premises and vehicle listed in this paragraph (collectively, "the Target Locations")and as further described in **Attachment A** to the search warrants:

(a)    235 Eighteenth Street, Apartment 204, Dracut, Massachusetts as more

2

fully described below and in Attachment A-1 hereto;

(b)   264 Mechanic Street, second floor, right side (as viewed from Mechanic Street), Leominster, Massachusetts as more fully described below and in Attachment A-2 hereto;

(c)   270 Fairmont Street, Apartment 1F, Fitchburg, Massachusetts as as more fully described below and in Attachment A-3;

(d)   Mini-Self Storage, 3 Foundry Street, Lowell, Massachusetts as more fully described below and in Attachment A-5;

(e)   212 Wilder Street, 2nd floor, Lowell, Massachusetts as more fully described below and in Attachment A-6; and

(f)   a blue 1994 Plymouth Voyager minivan bearing Massachusetts registration 5133XA registered to Santiago ("Santiago minivan") and parked in the vicinity of Santiago's residence as more fully described below and in Attachment A-7

for evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §§846, 841(a)(1) and 841(b)(1)(B) as described more fully in **Attachments B** to the search warrants.

8.   This affidavit includes a summary of events that I am personally familiar with as well as information related to me by other law enforcement personnel who have been working on this investigation. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish the requisite foundation for issuance of a criminal complaint against the Target Subjects and the issuance of search warrants for the Target Locations.

3

### Overview of Investigation

9.      As more fully set forth below, evidence gathered to date in this investigation reveals that the Target Subjects are involved in a conspiracy to possess with intent to distribute and to distribute heroin. This investigation has involved information including but not limited to information received from confidential informants, purchases of heroin by an undercover agent in December 2003 and January 2004, telephone calls intercepted by and/or between the Defendants pursuant to court-authorized wiretaps on one cellular telephone used by RIVERA, three cellular telephones and a pager used by SANTIAGO and one cellular telephone used by TAVO (collectively, "the Target Telephones"), physical surveillance, information gathered by a Global Positioning Satellite ("GPS") device installed on the Santiago's minivan and review of subscriber information, pen register data and toll records relating to phones used by Defendants and/or their associates.

### A. Target Subjects

#### 1.      JULIO SANTIAGO, a/k/a MACHO ("SANTIAGO")

10.     JULIO SANTIAGO is 45 years old and resides at 264 Mechanic Street, 2nd floor, Leominster, Massachusetts. He is the user of 347-200-5004, a T-Mobile cellular telephone with no subscriber information ("Target Telephone 1"), 347-248-7669, a T-mobile cellular telephone with no subscriber information ("Target Telephone 2"), 917-815-3487, a T-Mobile telephone with no subscriber information other than a March 10, 1981 date of birth ("Target Telephone 3") and 978-788-0589, a paging device bearing a cap code of A009880984, operating on frequency 929.6625MHz, owned by Metrocall Wireless, 890 East Heinburg Street, Pensacola, FL 32502, and subleased to New England Paging, a reseller, at P.O. Box 1644, Lowell, Massachusetts ("Target Pager"). As described further below, SANTIAGO has been intercepted via Target Telephones 1, 2 and 3, his cellular telephones, talking with various customers including AGOSTO, TORRADO, SANCHEZ, RODRIGUEZ, RIVERA, PITO, TORREZ and others in coded language about heroin transactions. He has also received numerous coded pages indicating quantities of drugs from some of these customers via the Target Pager. SANTIAGO has also been intercepted speaking

4

with TAVO, the person who is believed to be a drug associate of SANTIAGO's. During the course of this investigation, surveillance has observed SANTIAGO driving the SANTIAGO minivan to meet with customers for delivery of drugs ordered via previously intercepted calls and/or pages, to meet with TAVO, and to travel to Brooklyn, New York where, based upon intercepted calls and surveillance, there is probable cause to believe that SANTIAGO receives quantities of heroin for distribution. Although SANTIAGO has been the target of two prior DEA drug investigations, he has no prior drug arrests or convictions. The investigation to date has revealed that SANTIAGO distributes significant quantities of heroin to various customers in the areas of Leominster and Lowell, Massachusetts.

## 2. **PEDRO ALBERTO MIRANDA, a/k/a TAVO ("TAVO")**

11.    TAVO, is 35 years old and resides at 212 Wilder Street, Lowell, Massachusetts. TAVO is the user of 978-408-9075, a Sprint cellular telephone subscribed in the name of Paula Llano, 212 Wilder St., Apt. 2, Lowell, Massachusetts ("Target Telephone 4").    Based upon interceptions between TAVO and SANTIAGO as well as SANTIAGO and others on the Target Telephones, there is probable cause to believe that TAVO is a drug associate of SANTIAGO's. Surveillance have observed that on several occasions, SANTIAGO used TAVO's 212 Wilder Street, Lowell residence as a place to meet with some drug customers and deliver heroin that intercepted calls had indicated that had been ordered from SANTIAGO. On at least one of these occasions, surveillance observed TAVO serving as a "lookout" to detect any law enforcement surveillance. TAVO has a pending case in Middlesex Superior Court for trafficking in heroin and trafficking in cocaine, as a result of an arrest in Lowell. At the time of his arrest in that matter, TAVO identified himself as CARLOS COLON and had a Massachusetts driver's license in that name. He was identified as PEDRO ALBERTO MIRANDA through fingerprint comparison at the time of his arrest.

5

### 3. REYNALDO RIVERA, a/k/a REY ("RIVERA")

12.     REYNALDO RIVERA is 25 years old and resides at 235 18th Street, Apartment 204, in Dracut, Massachusetts. RIVERA does not have any criminal convictions. RIVERA is the user of 978-423-8173, an AT&T cellular telephone subscribed in his name ("RIVERA cell phone"). In or about June 2003, CI-3 provided information that an individual (later identified as RIVERA) was engaged in a series of apparent drug transactions occurring in the parking lot of the Old English Village apartment complex at 235 18th Street where RIVERA resides. According to CI-3, up until July of 2003, RIVERA had been conducting the above-described transactions most frequently inside Santiago's minivan, which was driven by a Hispanic male CI-3 later identified from a photograph as SANTIAGO. Surveillance at this location on July 29, 2003 confirmed that RIVERA met with the operator of the SANTIAGO minivan and engaged in a hand-to-hand exchange with the operator of Santiago's minivan. As discussed further below, an undercover agent arranged several heroin transactions with RIVERA in December 2003 and January 2004 and RIVERA arranged the delivery of the heroin through ARROYO and REYES. Surveillance during the last of the undercover agent's negotiations with RIVERA in February 2004 tentatively identified SANTIAGO as RIVERA's source of supply for heroin. Subsequently intercepted calls over the Target Telephones and the seizure of 20 grams of heroin that SANTIAGO left for RIVERA in his car on June 7, 2004 confirmed that SANTIAGO is RIVERA's source of supply.

### 4. JOSE RODRIGUEZ ("RODRIGUEZ")

13.     RODRIGUEZ is 42 years old and has a long history of drug trafficking. He is currently charged in Lowell District Court with possession of heroin with intent to distribute and conspiracy to violate the Controlled Substances Act for the 60-gram seizure from RODRIGUEZ's person and his residence on June 6, 2004 after intercepted calls with SANTIAGO and a delivery of same by SANTIAGO.

### 5. ENRIQUE AGOSTO ("AGOSTO")

14.     ENRIQUE AGOSTO is 39 years old and has a history of drug-related convictions.

6

On May 26, 1992, AGOSTO was convicted in Lowell District Court of distribution of cocaine, larceny, and breaking and entering in the nighttime with the intent to commit a felony. He was given a one-year house of correction sentence with ten days to serve; the balance was suspended for one year. On September 24, 1992, AGOSTO was convicted in Lowell District Court of distributing cocaine and heroin and was given a two-year sentence, with one year to serve and the balance suspended for two years. On October 10, 1994, AGOSTO was convicted in Middlesex Superior Court of possession of heroin with intent to distribute, second or subsequent offense, and was sentenced to state prison for five years. On May 5, 2004, Lowell, Massachusetts police officers arrested AGOSTO and seized approximately 15 grams of heroin from him. (I note that up to the time of this arrest, AGOSTO had not yet been identified as a target of this investigation and DEA had not yet been intercepting any of SANTIAGO's telephones). Based upon intercepted calls between AGOSTO and SANTIAGO, intercepted pages to the Target Pager and surveillance, there is probable cause to believe that AGOSTO is a heroin customer who has purchased distribution quantities of heroin from SANTIAGO.

### 6. JOSE TORRADO ("TORRADO")

15.     JOSE TORRADO is 23 years old and has no prior criminal convictions. He resides at 241 Moody Street, Lowell, Massachusetts. CI-2 identified TORRADO as one of RIVERA's drug associates. CI-1 informed law enforcement authorities in January 2003 that there had been a home invasion at TORRADO's Moody Street residence and that he had been robbed of 140 ten-gram fingers of heroin and $10,000 in cash and, as a result, TORRADO was looking to obtain a gun. On January 5, 2003, a Lowell Police Department detective observed a hand-to-hand transaction between TORRADO and two males at the Music Mall on Chelmsford Street in Lowell. Officers followed the two men as they departed the area in their vehicle and later stopped the vehicle. Although no heroin was discovered during the stop, both men admitted to having just bought heroin from an individual they knew as "Jose" (later identified as TORRADO) and that they had thrown the heroin out of the window before the car stop. Between November 2003 and March 2004, TORRADO drove a silver Toyota Matrix with Massachusetts license plate number 4985YL, which was registered to

7

RIVERA at his address. Intercepted calls over RIVERA's cell phone confirmed that TORRADO was a drug associate of RIVERA's. Based upon intercepted calls between TORRADO and SANTIAGO, intercepted pages to the Target Pager and surveillance, there is probable cause to believe that TORRADO is a heroin customer who has purchased distribution quantities of heroin from SANTIAGO. After surveillance of TORRADO meeting with SANTIAGO (which followed intercepted calls in which TORRADO, in coded language, ordered a quantity of heroin) on August 26, 2004, TORRADO engaged in counter-surveillance moves. Soon thereafter, law enforcement officers stopped TORRADO's vehicle. A search of TORRADO and his vehicle did not uncover any drugs. However, retracing the path of TORRADO's vehicle, law enforcement officers found a McDonald's cup containing approximately 10 grams of heroin. In subsequently intercepted calls, TORRADO informed SANTIAGO that he had lost the heroin that SANTIAGO had given him and they made arrangements for another transaction.

### 7. CARLOS SANCHEZ ("SANCHEZ")

16.    Carlos SANCHEZ is 22 years old and resides at 270 Fairmont Street, Apartment 1F, Fitchburg, Massachusetts. SANCHEZ has no criminal convictions. Based on intercepted conversations with SANTIAGO, intercepted pages to the Target Pager and surveillance, there is probable cause to believe that SANCHEZ is a heroin customer of SANTIAGO's who has purchased distribution quantities of heroin from SANTIAGO. Intercepted pages indicate that SANCHEZ has ordered quantities of heroin as large as 250 grams ("250" page) from SANTIAGO on numerous occasions. On October 7, 2004 after a "250" page and a series of intercepted calls via Target Telephone 3 in which SANTIAGO and SANCHEZ agreed to meet, surveillance agents observed SANCHEZ and SANTIAGO meet.

### 8. LUIS R. SANCHEZ a/k/a PITO ("PITO")

17.    PITO is 30 years old and resides at 427 Rosewood, Lane, Lowell, Massachusetts. Based on intercepted conversations with SANTIAGO, intercepted pages to the Target Pager and surveillance, there is probable cause to believe that PITO is a heroin customer of SANTIAGO's who has purchased distribution quantities of heroin from SANTIAGO.

8

### 9. EDWIN TORREZ a/k/a COQUI ("TORREZ")

18.     Edwin TORREZ is 38 years old and resides at 219 Black Brook Road, Lowell, Massachusetts. TORREZ has no known criminal record. Based on intercepted conversations with SANTIAGO and surveillance, there is probable cause to believe that TORREZ is a heroin customer of SANTIAGO's who has purchased distribution quantities of heroin from SANTIAGO. Surveillance agents have observed TORREZ meeting with SANTIAGO at TORREZ's Black Brook Road, Lowell residence, the Mini Self-Storage location that there is probable cause to believe is TORREZ's stash location and at TAVO's 212 Wilder Street, Lowell residence.

### 10. ZULEIMA REYES ("REYES")

19.     REYES is 23 years old and resides at 19 Conlon Terrace, Lowell, Massachusetts. She has no prior criminal convictions. As discussed further below, REYES, at the direction of RIVERA, delivered heroin to an undercover agent on December 18, 2003, January 7, 2004, January 14, 2004 and January 30, 2004. After the January 7th transaction, surveillance agents followed REYES and observed her engage in a hand-to-hand exchange with a customer. After this customer was subsequently stopped, law enforcement officers recovered ten bags of heroin from his vehicle that the customer confirmed that he had just purchased the heroin from REYES and had previously purchased heroin from REYES. Subsequently intercepted calls over the RIVERA cell phone confirmed that REYES was a drug associate of RIVERA's.

### 11. SANTIAGO ARROYO ("ARROYO")

20.     ARROYO is 20 years old and his last known address is 4 Murray Court, Apartment 6A, Nashua, New Hampshire. ARROYO drives a blue Chevrolet Cavalier bearing Massachusetts license plate registration 1641SJ, which is registered in ARROYO's name at 1016 Middlesex Street, Apartment AI, Lowell, Massachusetts, an address which a confidential informant ("CI-2") identified as a former RIVERA stash house. CI-2 also identified ARROYO as a "runner" (i.e., a deliverer of drugs to customers) for RIVERA but who has since been fired by RIVERA. As discussed further below, ARROYO, at the direction of RIVERA, delivered heroin to an undercover agent on one occasion on December 10, 2003.

9

## B. TARGET LOCATIONS

### 1. 235 Eighteenth Street, Apartment 204, Dracut, Massachusetts

("Rivera's 235 Eighteenth Street, Dracut residence")

### Description of premises (Attachment A-1)

21.     235 Eighteenth Street in Dracut is the Old English Village apartment complex which is composed of three free-standing, brick and wood-frame, multi-unit apartment buildings. The middle of the three buildings bears the digits "235" in the center of a glass entrance door located on the left side and toward the front of the building as viewed from Eighteenth Street. Inside this main entrance door is a small vestibule with mailboxes. The mailbox for Apartment 204 bears the name "RIVERA." Apartment 204 itself is located on the second floor of this building. The front door to the apartment is brown and the digits "204" in gold are located in the center of the door.

22.     RIVERA resides at this location.[1]  The cellular telephone that he uses to contact SANTIAGO, RIVERA's cell phone, is subscribed in his name at this address. The parking lot of the Old English Village apartment complex where Rivera's 235 Eighteenth Street, Dracut residence is located is where surveillance agents had observed RIVERA meet with SANTIAGO in SANTIAGO's minivan on February 12, 2004 after an undercover agent had negotiated with RIVERA to purchase eight ten-gram fingers of heroin in what appeared to be an apparent drug transaction. More recently, on October 13, 2004, surveillance observed SANTIAGO travel to and enter RIVERA's residence after intercepted calls and a page indicating that RIVERA wanted to purchase 14 fingers of heroin.

---

[1]Although RIVERA was barred from this residence on or abut February 17, 2004 as the result of a temporary restraining order, the order was in effect for approximately ten days. Based upon recent surveillance and intercepted calls, RIVERA still resides at this location.

**2. 264 Mechanic Street, second floor, right side (as viewed from Mechanic Street), Leominster, Massachusetts**
("SANTIAGO's 264 Mechanic Street, Leominster residence")

**Description of premises (Attachment A-2)**

23.     264 Mechanic Street is a blue-colored, wood-frame building which houses the Crystal dry cleaning establishment on the first floor in the front of the building, as well as apartments on the rear of the first floor and on all of the second floor. SANTIAGO's residence is located on the right side of the second floor as viewed from Mechanic Street. The entrance to the second-floor, right-side apartment is accessed at the rear of the building via a set of wooden stairs leading up to a small wooden porch. On the porch there are two doors. Access to SANTIAGO's apartment is gained through the door on the left as viewed from the rear of the building. A white storm door covers a solid brown panel door. (A photograph of 264 Mechanic Street is attached to Attachment A-2).

24.     Based upon intercepted calls to Target Telephones 1, 2 and 3, intercepted pages to Target Pager, all used by SANTIAGO, and physical surveillance and GPS tracking of SANTIAGO's minivan, SANTIAGO has traveled from SANTIAGO's 264 Mechanic Street, Leominster residence on numerous occasions to meet with drug customers and, on numerous occasions, has returned to this location after meeting with drug customers. Most recently, on October 9, 2004, surveillance observed SANTIAGO travel in Santiago minivan from SANTIAGO's 264 Mechanic Street, Leominster address to TAVO's 212 Wilder Street, Lowell residence for AGOSTO who had ordered heroin in previously intercepted calls that day.

**3. 270 Fairmont Street, Apartment 1F, Fitchburg, Massachusetts**

("SANCHEZ'S 270 Fairmont Street residence")

**Description of premises (Attachment A-3)**

25.     270 Fairmont Street, Fitchburg, MA is a four story light green vinyl sided, multi family dwelling with white trim. There is one apartment on each floor for a total of four apartments. There are four mailboxes. The names TORO, SANCHEZ, DIKOVIC are listed on the first floor mailbox. The door to the first floor is tan in color, with the numerals 270 affixed to the building to

11

the left of the first floor door. (A photograph of 270 Fairmont Street, Apartment 1F, Fitchburg, Massachusetts is attached to Attachment A-3).

26. SANCHEZ resides at SANCHEZ'S 270 Fairmont Street residence. A check with the Fitchburg Gas and Electric Company, Unitil Energy System, revealed that SANCHEZ and his wife, Sujail TORO, are the gas and electric subscribers at this location. Most recently, on October 7, 2004 surveillance observed SANTIAGO travel to SANCHEZ's 270 Fairmount Street residence after intercepted calls between SANTIAGO and SANCHEZ in which SANCHEZ ordered a quantity of heroin.

### 5. Mini Self-Storage, 3 Foundry Street, Lowell, Massachusetts
("Mini Self-Storage location")

### Description of premises (Attachment A-5)

27. The first floor of the storage building located at Mini Self Storage, 3 Foundry Street, Lowell, Massachusetts is located in the left rear portion of the Mini Storage lot. It is located in a two story building with dark colored metal siding on the front of the building with white clapboard siding on the end of the building. A blue and white sign with the words, MINI SELF-STORAGE Tel. 978-453-8206, printed on it, is located on the top right corner of the side of the building. The entrance to the first floor is located on the right end of the building as viewed from foundry Street. The entrance consists of a set of solid white double doors. There are no numbers printed on the doors. (A photograph of Mini-Self Storage, 3 Foundry Street, Lowell, Massachusetts is attached as Attachment A-5).

28. There is probable cause to believe that the Mini Self-Storage location is believed to be a location that TORREZ uses to stash heroin. On more than one occasion, surveillance has observed TORREZ unlocking the doors to the first floor of this location. (Previous information received from the clerk employed at this location is that the first floor is rented to a single individual (who she did not identify) and that this space is separate from the rental units on upper level that are saccessed from stairs on the outside of the building). On October 9, 2004, there were intercepted calls between SANTIAGO and TORREZ about meeting the next day. Later that day, however, the

12

GPS device on SANTIAGO's minivan revealed that it had traveled to the Mini Self-Storage location and had remained there approximately seven minutes.

### 6. 212 Wilder Street, 2nd Floor, Lowell, Massachusetts
("TAVO'S 212 Wilder Street residence")

### Description of premises (Attachment A-6)

29.    212 Wilder Street, 2nd floor, Lowell, Massachusetts, is located in a two story, wood framed, two family residence, with white clapboard siding. It is located behind 210 Wilder Street down a short alley/driveway. The numerals 212 are affixed to the post supporting the porch to the front 2nd floor entrance. The front door to 212 Wilder Street, 2nd floor, is white in color with a white storm door and faces the alley/driveway. It is accessed from a porch which is reached by climbing a set of wooden stairs attached to the outside of the residence. (A photograph of 212 Wilder Street, 2nd Floor, Lowell, Massachusetts is attached to Attachment A-6).

30.    TAVO resides at TAVO's 212 Wilder Street residence. On several occasions, SANTIAGO has arranged to meet customers at this location for the delivery of heroin. On the most recent occasion on October 9, 2004 (as discussed further below in paragraphs 82), SANTIAGO arranged to meet with AGOSTO at TAVO's residence for what there is probable cause to believe was a heroin transaction.

### 7. Blue 1994 Plymouth Voyager minivan bearing Massachusetts registration 5133XA registered to Santiago
("the SANTIAGO minivan")

### Description of vehicle (Attachment A-7)

31.    The motor vehicle to be searched and seized is a blue 1994 Plymouth Voyager minivan bearing Massachusetts registration 5133XA and VIN 2P4GH45R5RR796331 registered to Julio Santiago at an address in Shirley, Massachusetts. (A photograph of the vehicle is attached to as Attachment A-7).    During the course of this investigation, SANTIAGO has been observed driving two motor vehicles: Santiago's minivan and a red 2004 Chrysler Sebring rental car, bearing New Hampshire license plate registration 464-208, which, according to the records of Merchants Rent-A-Car at 1278 Hooksett Road, Hooksett, New Hampshire, was rented by Julio SANTIAGO

at a Shirley, Massachusetts address which also is the address appearing on Santiago's Massachusetts driver's license. However, SANTIAGO has only been observed driving the Santiago minivan when making heroin deliveries to his customers. Accordingly on or about June 28, 2004, DEA obtained a court order authorizing the installation of a GPS device within the SANTIAGO minivan and the device was installed on or about July 15, 2004. Since then the order has been renewed on August 13, 2004 and September 10, 2004. Based upon physical surveillance and GPS tracking of the vehicle in conjunction with intercepted calls on Target Telephones 1, 2 and 3 and intercepted pages to the Target Pager, SANTIAGO has driven the SANTIAGO minivan to deliver heroin to various customers.

## II. PROBABLE CAUSE FOR CRIMINAL COMPLAINT FOR TARGET SUBJECTS

### Controlled Purchases of Heroin
### from RIVERA and His Associates, ARROYO and REYES

32.    Between December 10, 2003 and January 30, 2004, DEA Task Force Agent Marcos Chavez ("TFA Chavez"), an undercover agent, made controlled purchases of over 100 grams of heroin from ARROYO and REYES, persons working for and at the direction of RIVERA. During this phase of the investigation, Julio SANTIAGO was also tentatively identified as RIVERA's heroin supplier.

33.    In late November, 2003, a confidential informant ("CI-2") who had been a heroin dealer reported to DEA that it had told RIVERA that it was no longer selling heroin and that RIVERA had approached CI-2 about purchasing CI-2's cellular telephone because RIVERA was interested in acquiring CI-2's former heroin customers. In early December, 2003, CI-2 sold its cellular telephone, (978) 854-4960, to RIVERA. Before doing so, and acting at the direction of DEA, CI-2 had added the undercover cellular telephone number of TFA Chavez into the directory of drug customers programmed into the cellular telephone's memory.

34.    On December 10, 2003, TFA Chavez called the cellular telephone which CI-2 had

14

transferred to RIVERA and spoke with a Hispanic male who identified himself as "Rey."[2]  TFA Chavez ordered one 10-gram "egg" of heroin[3] from RIVERA who agreed to meet TFA Chavez at the Showcase Cinema on Reese Avenue in Lowell at 1:00 p.m.  Immediately after that conversation, pen register data on the telephone showed an outgoing call from (978) 423-8173 ("RIVERA cell phone") to a cellular telephone listed to Santiago ARROYO and, thereafter, six additional calls between those two telephones between 12:47 p.m. and 1:25 p.m..

35.    At approximately 1:31 p.m., a blue Chevrolet Cavalier registered to ARROYO arrived at the Showcase Cinema location.  The vehicle was occupied by ARROYO and an unidentified female.  After identifying himself as "Santiago," ARROYO handed TFA Chavez a clear plastic bag, which contained a brown pellet of heroin, in exchange for $950.  When TFA Chavez complained that the price was too high, ARROYO stated that TFA Chavez would have to speak with "Rey" about that.  Three minutes after ARROYO met with TFA Chavez, pen register data showed an outgoing call from ARROYO'S cell phone to RIVERA'S cell phone.  Subsequent laboratory analysis revealed that the drugs purchased on this occasion from ARROYO contained 9.6 grams of heroin.

36.    On December 18, 2003, at approximately noon, TFA Chavez again called the cellular telephone which CI-2 had sold to RIVERA and heard a recorded message in a male Hispanic voice indicating that the number assigned to the phone had been changed to 978-726-3971 ("REYES cell phone").  Sprint records reveal that this number is assigned to a Sprint PCS cellular telephone listed to Zuleima REYES, at 19 Conlon Terrace, Lowell, Massachusetts.  When TFA Chavez called the REYES cell phone, REYES answered the call, identifying herself as "Linda."  She explained that "Rey" was not around and asked what TFA Chavez wanted.  TFA Chavez indicated that he wanted

---

[2]TFA Chavez later listened to conversations that were later intercepted between RIVERA and SANTIAGO on the Target Telephones and has recognized the voice of RIVERA as the voice of "Rey."

[3]Based upon my training and experience, I know that even a quantity of 10 grams of heroin is a distribution quantity, not a personal use quantity, of heroin.  Heroin is sold to users in baggies, usually in baggies of heroin with generally not more than .05 gram of heroin in each baggie. Accordingly, a 10-gram quantity will yield, at a minimum, 200 baggies.

15

to purchase thirty grams of heroin. REYES replied that she only had one "finger" (meaning one ten-gram finger of heroin) and that she would have to call "the Boss." She asked TFA Chavez to call back in a little while. Pen register data show an outgoing call shortly thereafter from the REYES cell phone to the RIVERA cell phone.

37.    When TFA Chavez called again at approximately 12:20 p.m., REYES agreed to meet him at the Showcase Cinema parking lot in Lowell and she described the vehicle she would be driving. Pen register data showed an outgoing call from the RIVERA cell phone to the REYES cell phone at 12:26 p.m. that lasted 37 seconds. At approximately 12:51 p.m., TFA Chavez met with REYES in the cinema parking lot. REYES arrived in a car registered to her mother and there were two young children buckled into child safety seats in the back seat of the car. After a brief conversation, during which TFA Chavez recognized REYES' voice as the voice of the "Linda" with whom he had spoken on the phone, REYES handed TFA Chavez a clear plastic bag containing three heroin pellets in exchange for $2,800. REYES agreed that TFA Chavez could owe her $50, which she claimed was her payment for delivering the drugs.    At 12:52 p.m., immediately after this transaction, pen register data showed an incoming call from the REYES cell phone to RIVERA'S cell phone that lasted less than two minutes. Subsequent laboratory analysis revealed that the drugs purchased by TFA Chavez on this occasion contained 29.4 grams of heroin.

38.    On January 7, 2004, TFA Chavez called REYES' cell phone and ordered twenty grams of heroin from REYES, who stated that she had to call her "boss" for the heroin and told TFA Chavez to call back in five minutes. Immediately after this call, pen register data showed an incoming call to RIVERA'S cell phone from a land line registered to REYES' mother at 19 Conlon Terrace in Lowell. While that call lasted only two seconds and may not have been completed, there was a series of five more calls between the same two phones, each lasting less than one minute, between 12:58 p.m. and 1:12 p.m. At approximately 1:31 p.m., TFA Chavez called back REYES, who agreed to conduct the transaction in the same cinema parking lot. Pen register data showed that the REYES cell phone was then used to place a twenty-second call to RIVERA'S cell phone at 1:34. Approximately three minutes later, REYES arrived at the appointed location, driving the same

16

vehicle with two small children again buckled into car seats in the rear of the car. After parking next to TFA Chavez, REYES handed him two heroin pellets wrapped in plastic in exchange for $1,950, including the $50 TFA Chavez owed REYES for the previous heroin delivery. In response to TFA Chavez's inquiries, REYES stated that "her boss" would not sell the heroin for less than $875 per "finger" (a ten-gram unit of heroin). She also stated that "the boss" could supply as much heroin as TFA Chavez wanted. Pen register data showed that the next contact between REYES' cell phone and RIVERA's cell phone occurred at approximately 1:53 p.m., shortly after REYES' meeting with the undercover agent. Subsequent laboratory analysis revealed that the drugs purchased by TFA Chavez on this occasion contained 20.0 grams of heroin.[4]

39.    On January 14, 2004, REYES called TFA Chavez from the REYES cell phone at approximately 12:14 p.m., responding to a message TFA Chavez had left for her on that phone earlier that day. TFA Chavez ordered 50 grams of heroin from REYES, who replied that she had at least thirty grams at her house, but that she might not have all fifty. Nevertheless, REYES stated that she would be ready to meet with TFA Chavez at 1:00 p.m. When TFA Chavez began to negotiate the price of the heroin, REYES stated that TFA Chavez would have to talk to "Rey" about that. REYES then arranged a three-way conference call between herself, TFA Chavez and "Rey." Pen register data confirm an outgoing call from the REYES cell phone to RIVERA'S cell phone at 1:16 p.m. that lasted ninety seconds. After joining the conversation, which was consensually recorded, RIVERA told TFA Chavez that he would lower the price to $900 per ten grams of heroin, but only if TFA Chavez intended to purchase large amounts. The parties agreed that TFA Chavez would meet REYES at the cinema parking lot. Pen register data showed a call from Rivera's cell

---

[4]After the January 7th transaction, surveillance agents followed REYES to the St. Hilaire Laudromat and Car Wash at 1682 Middlesex Street, Lowell, Massachusetts where agents observed her engage in a hand-to-hand exchange with a male.. Surveillance followed her customer and his vehicle stopped by police. A search of the center console of the vehicle revealed ten bags (containing a total of approximately one-half gram of heroin). The customer informed law enforcement officers that he had purchased 10 bags of heroin from "Linda" two to three times a week since early December 2003. He also provided the REYES cell phone number as the number he had used to contact Linda. Based upon this information and earlier surveillance, I believe Linda is REYES.

17

phone to the REYES cell phone at 12:18 p.m., shortly after the termination of the conference call, lasting one minute and forty-three seconds.

40.    At approximately 1:00 p.m., after arriving at the cinema parking lot, TFA Chavez called REYES, who explained that she only had four and a half "fingers," or approximately 45 grams of heroin. TFA Chavez insisted that he wanted all fifty grams. REYES responded that she would call "Rey" and that she would call TFA Chavez back in five minutes. Pen register data confirmed an outgoing call from REYES' cell phone to RIVERA'S cell phone at 1:04 p.m. that lasted two minutes and 35 seconds and another such call at 1:13 p.m. that lasted just eight seconds. At 1:25 p.m., REYES called TFA Chavez and said that she had only 46 grams and that the price would be $4,300. She further indicated that she did not want to meet at the cinema parking lot because she feared detection, referring specifically to security cameras and security guards in the area, as well as a police cruiser that patrolled the nearby Cross Point Towers. REYES also stated that recently "somebody" (which TFA Chavez took to mean another drug dealer) had been arrested in the area. Accordingly, it was agreed that TFA Chavez and REYES would meet in a quiet side street near the intersection of Chelmsford and Stevens Streets in Lowell.

41.    Surveillance officers then followed REYES from her residence at 19 Conlon Terrace in Lowell directly to the meeting with TFA Chavez. REYES arrived at approximately 1:37 p.m., again with her two young children in the back seat, and gave TFA Chavez a plastic bag containing six pieces of light brown heroin in exchange for $4,300. Subsequent laboratory analysis revealed that the drugs purchased on this occasion contained 45.7 grams of heroin.

42.    On January 29, 2004, the undercover agent called the Reyes cell phone again. The agent ordered three fingers of heroin from REYES on this occasion. They agreed to meet at Wendy's on Route 38 in Lowell, Massachusetts the following day. On January 30, 2004, they met at this location where REYES gave the undercover agent a white paper towel containing a clear plastic bag with three pellets of heroin. Subsequent laboratory analysis revealed that the drugs purchased on this occasion contained 30 grams of heroin.

18

43. On February 12, 2004, TFA Chavez received a call from REYES at about 11:17 a.m. REYES told TFA Chavez she had "Rey" on the phone so they could do a three-way call. According to pen register data, RIVERA called REYES on February 12, 2004 at 11:07 a.m., 11:14 a.m. and again at 11:15 a.m., which would have been minutes before she called TFA Chavez. During the phone call between TFA Chavez, RIVERA and REYES, TFA Chavez negotiated with RIVERA for a lesser price per "finger" of heroin. RIVERA asked TFA Chavez when he wanted to purchase the heroin. TFA Chavez replied he wanted it that same day, February 12. RIVERA told TFA Chavez that REYES would get back to him in a few minutes. The call was terminated. Following the three-way call, pen data showed RIVERA calling at 11:24 a.m. Target Telephone 1, a cellular telephone used by SANTIAGO. After the call to SANTIAGO, RIVERA called REYES at 11:25 a.m. and again at 11:35 a.m. TFA Chavez received a call from REYES at 11:38 a.m. letting him know that she would not be ready to sell him any heroin for about two hours as she was waiting for "the guy" to come down.

44. During the time TFA Chavez was communicating with REYES on February 12, 2004, surveillance agents were stationed at and around RIVERA's 235 Eighteenth Street residence. At 12:33 p.m., DEA Special Agent Michael O'Shaughnessy observed the SANTIAGO minivan enter the parking lot at RIVERA'S 235 Eighteenth Street residence. (Pen register data showed an incoming call from Target Telephone 1 to RIVERA's cell phone at 12:27 p.m.) SANTIAGO was observed to be driving the SANTIAGO minivan. SANTIAGO parked in front of a 1999 black GMC Yukon, bearing Massachusetts registration plate 4740YR, registered to Reynaldo RIVERA at 235 Eighteenth Street. Shortly after SANTIAGO parked, RIVERA walked out to the parking lot and got into the SANTIAGO minivan. RIVERA was in the SANTIAGO minivan a few minutes, got out and SANTIAGO left the parking lot.

45. After RIVERA got out of the SANTIAGO minivan at about 12:35 p.m., he got into his Yukon. Special Agent O'Shaughnessy saw RIVERA on his cell phone while getting out of the Yukon. Pen register data showed that the RIVERA cell phone called the REYES cell phone at 12:36 p.m. Immediately following the call to REYES, RIVERA called SANTIAGO at 12:36 p.m.

19

RIVERA made eight phone calls to REYES between 12:37 and 2:31 p.m. RIVERA was subsequently followed to Billerica where at 2:59 p.m. he drove into the Kmart Warehouse where he then worked. Surveillance was terminated and TFA Chavez did not follow up with REYES and never consummated the heroin transaction that he had negotiated with RIVERA that day. Subsequently, RIVERA and REYES refused to engage in further drug transactions with the undercover agent. I believe that they took this position in retaliation for the undercover agent's failure to consummate the February 12th deal and/or they suspected that he was connected to law enforcement. As the subsequently intercepted calls and other evidence developed in this investigation confirm, however, RIVERA and REYES continue to engage in drug transactions.

### Interception of RIVERA's Cell Phone[5]

46.    On March 12, 2004, the Honorable Nancy Gertner authorized the interception of wire communications occurring over 978-423-8173, a Nextel cellular telephone subscribed to in the name of Target Subject REYNALDO RIVERA ("the RIVERA cell phone"). Interceptions over the RIVERA cell phone occurred between March 16, 2004 and April 1, 2004. During the interception of the RIVERA cell phone, conversations between RIVERA and SANTIAGO, TORRADO, REYES and other individuals not named in this complaint were intercepted. The interceptions over the RIVERA cell phone confirmed that SANTIAGO was a source of supply for RIVERA. For example, in a March 18, 2004 series of calls, RIVERA (using RIVERA's cell phone) told SANTIAGO (using Target Telephone 1) that he had "five guys" going to the airport and wanted to know if SANTIAGO could take them. Later that day, surveillance observed RIVERA meeting with SANTIAGO in SANTIAGO's minivan in the parking lot of RIVERA's 235 18th Street, Dracut residence. The

---

[5]Intercepted conversations on the Target Telephones were in Spanish. The summaries of intercepted conversations on the Target Telephones set forth in this affidavit are based upon summaries of conversations and draft translations that have been prepared by monitors who are fluent in Spanish and English. The calls summarized below are not all of the calls that have been intercepted, nor are the summaries verbatim accounts of each call. The summaries are based upon preliminary summaries of the calls prepared by monitoring agents and information from agents involved in this investigation. Where necessary, an interpretation of the substance of the calls based upon my training and experience and the information developed to date in this investigation is provided.

meeting lasted approximately three minutes and which RIVERA exited and entered the apartment building where his residence is located. Based upon the intercepted calls, surveillance and evidence gathered in this investigation, I believe that "five guys" was a reference to five units of heroin and that SANTIAGO met with RIVERA to deliver the quantity of heroin to him. The intercepted calls over the RIVERA cellphone also confirmed that TORRADO[6] and REYES were drug associates of RIVERA's. For example, in a March 24, 2004 call, at approximately 2:33 p.m., TORRADO called RIVERA and asked him, "Is there something there for me?" to which RIVERA responded, "You need to go pick it up...over there...not at the slope (meaning RIVERA's residence), but down there." TORRADO asked whether RIVERA meant "at the girl's?" to which RIVERA replied "Yes." Based upon my training and experience and the facts and circumstances of this investigation, I believe that RIVERA was advising TORRADO that he had drugs for TORRADO, but that TORRADO would have to go get the drugs from REYES.

47.    On April 1, 2004, DEA ceased interceptions over the RIVERA cell phone because it had become apparent to DEA that RIVERA had decreased his use of the RIVERA cell phone. I believe that the change in use of the RIVERA cell phone was due in part to CI-2's arrest by the Lowell Police Department on drug charges[7] which "spooked" RIVERA and because he became suspicious that law enforcement was investigating him.

**Interception of Target Telephones Used by SANTIAGO**

**Interception of Target Telephone 1 in June 2004 and Related Seizures Confirm that SANTIAGO Is Distributing Heroin**

48.    On June 2, 2004, DEA initiated a court-authorized wiretap on Target Telephone 1, the same telephone that SANTIAGO had used to communicate with RIVERA as discussed above. Interceptions over Target Telephone 1 began on June 2, 2004 and were terminated on July 1, 2004.

---

[6]In at least one intercepted call, on March 18, 2004, I believe that TORRADO was instructing RIVERA and an unidentified male about how to cook cocaine base.

[7]Information that had been previously provided by CI-2 in this investigation was corroborated by other information obtained in this investigation and, upon his arrest described above, CI-2 was deactivated as a confidential informant.

21

Almost as soon as the interception of Target Telephone 1 began, SANTIAGO and callers to Target Telephone 1 began to complain about problems with the telephone. As a result, SANTIAGO purchased a new telephone (Target Telephone 2) and his use of Target Telephone 1 waned. However, during the period of interception between June 2, 2004 and July 1, 2004, intercepted calls over Target Telephone 1 (and related surveillance) between SANTIAGO and RIVERA confirmed that SANTIAGO was RIVERA's source of supply for heroin. Intercepted calls over Target Telephone 1 (and/or related surveillance) also revealed that SANTIAGO supplied heroin to other customers.

<u>Santiago's Delivery of 60 Grams of Heroin to RODRIGUEZ</u>

49. At approximately 11:49 a.m. on June 6, 2004, SANTIAGO called RODRIGUEZ at (508) 982-0573, listed in Rodriguez's name at 261 Aiken Avenue in Lowell, Massachusetts. During the course of this intercepted conversation, SANTIAGO asked if RODRIGUEZ "still need[ed] 'the money'" and RODRIGUEZ answered affirmatively. SANTIAGO then indicated that he was going to take sixty (60) "dollars" out of the bank and would then call RODRIGUEZ, but asked if RODRIGUEZ would be there for sure so that SANTIAGO did not make the trip for nothing. RODRIGUEZ assured that he would be there. RODRIGUEZ indicated that he had to take his sister to the flea market but would return before 3:00 p.m. SANTIAGO then reiterated that he would withdraw "that" from that "account" and they agreed to speak again later. I understood that, in this intercepted conversation, SANTIAGO confirmed that RODRIGUEZ still wanted to purchase sixty (60) units of heroin and agreed to deliver them that afternoon.

50. Based on the foregoing and other intercepted telephone conversations, surveillance was established shortly after noon in the vicinity of the intersection of Seventh and Mechanic Streets in Leominster, Massachusetts. At approximately 2:30 p.m., a surveillance unit saw SANTIAGO drive the SANTIAGO minivan out of a small lot behind SANTIAGO'S 264 Mechanic Street residence.

51. At approximately 3:32 p.m., SANTIAGO called RODRIGUEZ, asked if the

22

latter had returned from the flea market and indicated that he had been waiting for RODRIGUEZ's call. RODRIGUEZ indicated that he had just returned and had called Target Telephone 1 but that the phone had rung busy. SANTIAGO indicated that was what a lot of people had told him, so he was going to get another cell phone the next day. SANTIAGO said he was leaving now to go "there" (meaning to meet RODRIGUEZ).

52.    At approximately 4:06 p.m., SANTIAGO called RODRIGUEZ and indicated he was "there" but asked how things were because he saw too many cars there. RODRIGUEZ assured SANTIAGO that everything was fine, but SANTIAGO asked if the cars belonged to people who knew them or to people who did not know them. RODRIGUEZ reiterated that everything was fine and SANTIAGO repeated that he had arrived.

53.    Based on the earlier calls between SANTIAGO and RODRIGUEZ, surveillance was established in the vicinity of RODRIGUEZ'S residence at 261 Aiken Avenue in Lowell at 4:00 p.m. that day. At approximately 4:10 p.m., a surveillance agent saw SANTIAGO driving the SANTIAGO minivan slowly past that address. About one minute later, the SANTIAGO minivan was seen pulling into a space in the driveway which had just been vacated by a Hispanic male driving a blue Nissan pickup truck. After parking Santiago's minivan, SANTIAGO was seen seated in Santiago's minivan, bending and shifting from one side to another, as if retrieving something from the van's interior. Approximately one minute later, the surveillance agent saw SANTIAGO exit Santiago's minivan and appear to fold under and then pull the bottom of his shirt. Another surveillance officer then saw SANTIAGO walk to the rear of the residence and walk up the stairs to the second-floor apartment. At approximately 4:39 p.m., a third surveillance officer saw SANTIAGO exit the residence, return to the SANTIAGO minivan and drive it out of the area. Surveillance was maintained on Rodriguez's residence. Based on the facts that the Lowell Police Department had recently executed a search warrant at that residence and RODRIGUEZ was facing outstanding drug charges in Lowell Superior Court, DEA was advised that it was likely that RODRIGUEZ would try to move any heroin delivered by SANTIAGO from RODRIGUEZ's residence as soon as possible. At approximately 6:40 p.m., a surveillance officer saw RODRIGUEZ

23

exit his apartment and walk from the rear of the premises out to Aiken Avenue, looking cautiously in all directions and with his right hand shoved deeply into the right pocket of his baggy running pants. RODRIGUEZ then began to walk inbound (south) on Aiken Avenue, still looking cautiously in all directions. Approximately a block and a half from his residence, RODRIGUEZ saw and waved down a black BMW driven by a Hispanic male later identified as Santiago Navarro. The BMW had been heading north on Aiken Avenue when it stopped at the intersection of Aiken and Hildreth Streets. RODRIGUEZ entered the front passenger seat of the BMW, which then headed inbound (south) on Aiken Avenue.

54.    The surveillance officer's observations, combined with his training and experience and his knowledge of RODRIGUEZ led the officer to believe that RODRIGUEZ was engaged in a drug transaction. A short while later, the BMW was stopped with the assistance of a marked police cruiser and both occupants were asked to and did exit the vehicle. As one detective pat-frisked RODRIGUEZ, a clear plastic baggie fell down the inside of RODRIGUEZ'S right leg and out the bottom of his pants. A second detective saw the bag fall and directed the first detective's attention to it. The bag was retrieved and it was found to contain a white rock and powder-like substance which the detective recognized as a "finger" of heroin. Another detective located in the rear passenger seat of the BMW a clear plastic bag containing what he immediately recognized as marijuana. Navarro was found to have $1,430 in cash on his person and RODRIGUEZ was found to have $270 in cash on his person. Both individuals were arrested and a loaded .22 caliber revolver was later retrieved from a small plastic case which was located under the driver's seat. Navarro was later charged with the illegal possession of the handgun and the heroin retrieved from RODRIGUEZ was later determined to weigh 10 grams.

55.    The Lowell Police Department then obtained a state warrant to search RODRIGUEZ'S apartment at 261 Aiken Avenue. During that search, approximately 50 grams of heroin were found in and seized from a drawer in the master bedroom. Based on the foregoing, I conclude that the "sixty dollars" referenced in Santiago's initial June 6 telephone conversation with RODRIGUEZ was a coded reference to 60 grams of heroin (the 10 grams of heroin seized from

24

Rodriguez's person and the 50 grams of heroin seized from his residence).

### Seizure of 20 Grams of Heroin Delivered by SANTIAGO to RIVERA

56. The following day, Monday, June 7, 2004, at approximately 11:54 a.m., RIVERA called SANTIAGO, asked if the latter were coming that day and whether SANTIAGO had recorded the "CD." SANTIAGO replied by saying he would call back, which he did at approximately 12:09 p.m., at which time RIVERA asked SANTIAGO to bring RIVERA a Salsa "CD" and a Bachata "CD." SANTIAGO repeated and RIVERA then confirmed the order. SANTIAGO asked if RIVERA wanted two different "CDs" or separate ones. RIVERA replied by asking SANTIAGO to put them in two different cases. I understand that, in this intercepted conversation, RIVERA asked SANTIAGO to deliver to him two units of heroin (possibly of differing qualities) to be separately packaged.

57. At approximately 1:13 p.m. on June 7, SANTIAGO called RIVERA and reported that he was "up on the hill." RIVERA told SANTIAGO that "the office" was open and "it" was there. SANTIAGO told RIVERA he would leave "the papers" there. SANTIAGO asked if RIVERA was talking about the same place in "the office," "the cabinet," where SANTIAGO had left "the papers." RIVERA told SANTIAGO to open the door and "they" will be there in a pouch. A few minutes later, at approximately 1:22 p.m., SANTIAGO called RIVERA and reported that he had left "the plant" there so that RIVERA could check on it and RIVERA agreed to do so.

58. However, in light of the earlier intercepted calls between SANTIAGO and RIVERA, law enforcement surveillance vehicles had followed SANTIAGO and had seen him place an item inside of a vehicle which was registered to RIVERA and was parked in the parking lot of the apartment complex in which RIVERA resides. SANTIAGO had not used a key to enter the vehicle, so, after SANTIAGO had departed the area, a surveillance agent opened the same door to RIVERA'S vehicle and, in a pouch on the inside of the door, found and retrieved two packages, each of which were later found to contain ten (10) grams of a substance which field-tested positive for heroin.

59. At approximately 6:07 p.m. on June 7, RIVERA called SANTIAGO and asked

25

where "the papers" were because he could not find them. Referring to the 20 grams of heroin which he had left in RIVERA's car, SANTIAGO replied that he had left "the papers" in "the drawer" where RIVERA had left "the papers" (possibly a reference to money). RIVERA insisted that "the papers" were not there and SANTIAGO swore on his mother that he had left them exactly in "the same drawer" where RIVERA had left "the papers" for SANTIAGO. RIVERA said he knew that SANTIAGO was not that kind of person, but that he could not find "the papers." RIVERA said that he had been trying to call SANTIAGO because he was worried but that Santiago's first target telephone had rung busy. They continued to discuss the disappearance of "the papers" and RIVERA indicated that he was counting on receiving them. SANTIAGO asked if anyone knew about their call (setting up the deal) and RIVERA replied in the negative. RIVERA asked if SANTIAGO had locked the door (to the car) and the latter indicated that he had not because he did not know if the car had an alarm system. SANTIAGO suggested that maybe somebody knew about it so RIVERA needed to check it out and asked RIVERA to call him back if RIVERA learned anything.

60.    On June 7 and 8, 2004, SANTIAGO and RIVERA had several intercepted conversations in which they discussed in veiled language the disappearance of the drugs from RIVERA's car. At approximately 7:01 p.m. on June 8, RIVERA called SANTIAGO, who asked if the former had been able to "solve 'that'" (referring to the disappearance of the heroin from Rivera's car). RIVERA replied in the negative and asked if SANTIAGO could go down "there." SANTIAGO indicated that he could not that day and that they could meet "down there" the next day. SANTIAGO told RIVERA to page him the next day and asked how many "guys" were going to "the company." RIVERA replied "two guys for now." I understand this to have been a coded reference to two units of heroin and, most probably, to two "fingers" or 20 grams of heroin to replace the heroin seized from RIVERA's car. RIVERA told SANTIAGO that, when RIVERA left his house the night before, all of the cars in the Old English Village parking lot had a piece of paper (on the windshield) indicating that several people had been seen wandering around and then RIVERA figured out what had happened yesterday (referring to the disappearance of the heroin from his car). SANTIAGO said that RIVERA had to check it out and that SANTIAGO would not go back to "that

26

hill" (meaning the Old English Village parking lot). RIVERA reiterated that the next day they would meet in another place. SANTIAGO agreed and reminded RIVERA to page him the next day.

61. The next day, June 9, 2004, at approximately 9:37 a.m., RIVERA called SANTIAGO to make plans for the latter to "come down." SANTIAGO said he was going to be delayed because he had to heat up the water, to which RIVERA replied that there was no hurry but would like to see SANTIAGO as soon as possible. They both laughed and SANTIAGO said he would try to get moving as quickly as possible.

62. At approximately 11:05 a.m., a surveillance officer saw SANTIAGO depart the vicinity of his residence driving the Santiago minivan. At approximately 11:32 a.m., SANTIAGO called RIVERA, who said he was "where the rubber is" (referring to the Tire Warehouse in Lowell, near where he was waiting for SANTIAGO). SANTIAGO said he would call RIVERA when he arrived and surveillance officers followed SANTIAGO in the SANTIAGO minivan to the vicinity of the Tire Warehouse, where he was seen meeting with RIVERA in the SANTIAGO minivan for approximately two minutes before RIVERA exited the SANTIAGO minivan and SANTIAGO drove away.

> **Interception of Target Telephone 1 in June 2004, Target Telephone 2 in July 2004, Target Telephone 1 and 2 in August and September 2004, Target Pager and Target Telephone 3 in September and October 2004 Shows that SANTIAGO Continues to Conduct Drug Business with Numerous Customers and Associates**

63. On or about June 8, 2004, SANTIAGO had re-activated Target Telephone 2 and gradually had stopped using Target Telephone 1 for drug-trafficking purposes in favor of Target Telephone 2. Accordingly, the previously court-authorized wiretap on Target Telephone 1 was terminated on or about July 1, 2004 and a court-authorized wiretap was initiated on Target Telephone 2 on June 29, 2004. Interception of Target Telephone 2 terminated on July 28, 2004. On August 16, 2004 DEA again initiated a court-authorized wiretap on Santiago's cellular telephones, Target Telephone 1 and Target Telephone 2. These interceptions continued until September 13, 2004 for Target Telephone 1 and September 7, 2004 on Target Telephone 2. The Court authorized

27

interception of electronic communications over the Target Pager, a paging device used by SANTIAGO, on September 9, 2004 and again on October 13, 2004. Interceptions of the Target Pager began on September 14, 2004 and are ongoing. The Court authorized a wiretap on Target Telephone 3 on September 29, 2004 and interceptions began on this telephone on September 30, 2004 and are ongoing. The following paragraphs discuss interceptions of SANTIAGO and other Defendants occurring on each of these telephones as they relate to each of the Defendants.

### SANTIAGO's Continued Heroin Transactions with RIVERA

64.    During a July 1, 2004 intercepted conversation over Target Telephone 2, RIVERA asked SANTIAGO for "four (4) in a bag." SANTIAGO confirmed the order and told RIVERA he would call RIVERA later. I understand "four (4) in a bag" to have been a coded reference to four "fingers" (10 grams each) of heroin loose, not compacted. At 1:08 p.m., SANTIAGO called RIVERA to ask where RIVERA was. RIVERA said he was heading to the "tire" place. SANTIAGO said he would meet him there. At 1:36 p.m., SANTIAGO called RIVERA to tell him he was at the tire place. RIVERA said he was going there. At 1:42 p.m., RIVERA called SANTIAGO to tell him some people were outside (possibly meaning surveillance personnel). They agreed to go to a street around the corner from the tire place. Surveillance officers followed SANTIAGO driving in the Santiago minivan to the vicinity of the Tire Warehouse at Hale Street in Chelmsford, Massachusetts, where SANTIAGO was observed meeting with RIVERA on other occasions, but on this occasion surveillance agents did not observe the meeting between SANTIAGO and RIVERA.

65.    On August 21, 2004 at approximately 1:46 pm an incoming call from RIVERA to Target Telephone 1 was intercepted. During the conversation RIVERA asked SANTIAGO if he had received the order. SANTIAGO replied in the affirmative and asked if the "guys" ( a previously coded reference to ten gram "fingers" of heroin, were going to play in the park today). They then made some coded references to the "food" being mixed and that they will work it out "over there." This appeared to be an indication that the heroin was not packaged in the exact amount that RIVERA has ordered and would need to be repackaged at RIVERA's residence. At approximately 2:08 p.m.

28

SANTIAGO called RIVERA and they agreed to meet on the "hill," a coded reference to RIVERA's 235 Eighteenth Street residence. At approximately 2:21 p.m., Task Force Agent Terry Hanson observed SANTIAGO arrive in the area of RIVERA'S 18th Street residence in the SANTIAGO minivan. At approximately 2:22pm SANTIAGO placed an outgoing call to RIVERA at (978)423-8173. During this call, SANTIAGO told RIVERA, "I'm here, open the door." At approximately the same time, TFA Hanson observed SANTIAGO at the door of RIVERA'S 235 Eighteenth Street. At approximately 2:31 pm, Det. Joseph Jakutis observed SANTIAGO return to his vehicle.

### Heroin deliveries from SANTIAGO to PITO

66.     On July 5, 2004 at approximately 9:56 p.m. a call was intercepted over Target Telephone 2 between SANTIAGO and PITO. During the ensuing conversation SANTIAGO asked PITO if he needed a "ride" tomorrow in the afternoon. PITO advised SANTIAGO that he would be available. SANTIAGO asked how many "guys" are going over there. PITO initially replied thirty or forty "guys" are going. PITO then indicated that thirty are going tomorrow. SANTIAGO told PITO that he would pass by the next day and would call PITO. SANTIAGO told PITO to have the group of guys and the "papers" to fill out. SANTIAGO has demonstrated in previously described conversations with RIVERA that he will use the code word "guys" when referring to amounts of heroin and "papers" when referring to money. In this conversation it is my understanding that PITO ordered 30 grams of heroin from SANTIAGO to be delivered the following day and that SANTIAGO wanted PITO to be sure and have the payment ready.

67.     The following day, July 6, 2004 at approximately 11:50 a.m. SANTIAGO called PITO and stated that he was going to leave to take the "guys" to the factory and asked PITO if he would be there. PITO replied in the affirmative and SANTIAGO told him to get ready. At approximately 12:21 p.m. that same date, SANTIAGO called PITO and asked him where PITO was. PITO replied that he was in "there." SANTIAGO told PITO to wait for him at the "company." These conversations indicate that SANTIAGO and PITO did meet to conduct the thirty gram heroin transaction.

68.     On August 26, 2004 at approximately 11:32 a.m., a conversation was intercepted
29

between PITO and SANTIAGO over Target Telephone 1. During the conversation SANTIAGO asked PITO if he needed him to "go fill out the papers." PITO replied in the affirmative and added that it would cost thirty "pesos." SANTIAGO told PITO to call him after work. Later that same date at approximately 2:03 p.m., another conversation between SANTIAGO and PITO was intercepted over Target Telephone 1. During that conversation PITO advised SANTIAGO that he had found out about the papers and the price went up. It was 50 "pesos" now. Based on previously intercepted coded conversations, where amounts of heroin are referred to in monetary units, it is my understanding that PITO arranged to purchase thirty grams of heroin from SANTIAGO, then revised the amount up to fifty grams of heroin.

69.    Later that same day August 26, 2004 between approximately 5:50 p.m. and 6:06 p.m. there were three intercepted conversations between SANTIAGO and PITO ultimately resulting in an agreement between them to meet at PITO's residence. At approximately 6:10 p.m., Special Agent Coletti drove to the area of 219 Black Brook Drive (TORREZ's residence) and 427 Rosewood Lane (PITO's residence) in Lowell, Massachusetts. Upon arrival, at approximately 6:11 p.m., Special Agent Coletti observed SANTIAGO in the parking lot of the "Redwood Terrace" housing complex, physically on Rosewood Lane. SANTIAGO was stationary in the Santiago minivan, backed into a parking spot and appeared to be monitoring vehicle traffic on Westford Road. A short time later, S/A Coletti observed SANTIAGO exit his vehicle, wearing a white t-shirt, denim shorts and white sneakers. SANTIAGO opened the hood of the van and appeared to remove an item from underneath the hood/engine compartment. Once finished, SANTIAGO closed the hood and returned to the driver's seat of the SANTIAGO minivan.

70.    At approximately 6:15 p.m., Special Agent Coletti observed SANTIAGO exit the van a second time and walk toward a Hispanic male, with short/shaved hair, wearing a blue t-shirt and yellow shorts later identified as PITO. PITO was observed by Special Coletti exiting 427 Rosewood Lane. Special Agent Coletti observed SANTIAGO and PITO engage in a brief conversation and then PITO walked over and entered the SANTIAGO minivan.

71.    A short time later, Special Agent Coletti and Special Agent Michael O'Shaughnessy

30

observed PITO exit the SANTIAGO minivan, clutching a shiny object in his left hand. PITO walked back to join SANTIAGO where Special Agent Coletti observed both enter 427 Rosewood Lane. At approximately 6:28 p.m., Special Agent Coletti observed SANTIAGO exit 427 Rosewood Lane. Based upon the interceptions and surveillance, I believe that SANTIAGO and PITO did meet to conduct the 50 gram heroin purchase.

**Heroin deliveries to SANCHEZ at 270 Fairmont Street, Fitchburg, MA**

72. On August 18, 2004 at approximately 3:16 p.m., an incoming call to SANTIAGO was intercepted. During the ensuing coded conversation SANCHEZ asked SANTIAGO if they would be able to see each other that night. SANTIAGO replied in the affirmative. SANCHEZ asked if they could meet after 8:00 p.m. SANTIAGO wanted SANCHEZ to be ready because he didn't want to wait. SANTIAGO asked SANCHEZ how much the "car part cost." SANCHEZ replied that "it's pretty cheap, $250.00." SANTIAGO advised SANCHEZ to be ready after 8:00 p.m. and that SANTIAGO would pick SANCHEZ up. At approximately 8:10 p.m., SANCHEZ called SANTIAGO on Target Telephone 1 and asked if SANTIAGO could wait 40 more minutes before going to pick SANCHEZ up. SANTIAGO agreed.

73. At approximately 9:30 p.m., Special Agent Willoughby observed SANTIAGO leaving his address at 264 Mechanic Street in the SANTIAGO minivan. At approximately 9:45 p.m. TFA Swift observed SANTIAGO parking the SANTIAGO minivan in front of SANCHEZ's 270 Fairmont Street residence. SANTIAGO exited his vehicle and was observed walking up the steps toward 270 Fairmont Street. At approximately 10:18 p.m. TFA Swift observed SANTIAGO leaving the area of SANCHEZ'S 270 Fairmont Street accompanied by a second Hispanic male wearing a long sleeved white button down shirt. SANTIAGO walked directly to his vehicle while the other Hispanic male looked in both directions up and down Fairmont Street.

74. Based upon numerous intercepted conversations previously mentioned in this affidavit in which SANTIAGO uses monetary amounts or car parts as code for quantities of heroin, I believe the above coded conversation and subsequent surveillance indicates that SANCHEZ ordered 250 grams of heroin from SANTIAGO and that SANTIAGO then delivered the heroin to

31

SANCHEZ at SANCHEZ's 270 Fairmont Street.

75.    In an October 1st call on Target Telephone 3 at approximately 5:34 p.m., SANTIAGO received a call from SANCHEZ. In this call, SANCHEZ asked if he could meet with SANTIAGO the following day. SANTIAGO asked if everything was fine. SANCHEZ indicated that it was and that it was for "Primo." SANTIAGO told SANCHEZ to call his pager and put the time that they were going to meet as a message. I believe that SANTIAGO's instruction to SANCHEZ "to put the time that they were going to meet" into the pager was code asking SANCHEZ to page him with the quantity of drugs that he wanted. At approximately 11:51 a.m. the following day (October 2nd), there was an intercepted call from SANTIAGO on Target Telephone 3 to SANCHEZ. SANTIAGO asked SANCHEZ if he had called SANTIAGO. SANCHEZ said no. SANTIAGO asked SANCHEZ if he needed a ride. SANCHEZ replied that he didn't know yet. SANTIAGO told SANCHEZ to let him know. At approximately 3:53 p.m on October 2nd, the Target Pager received a "50" page which I believe was code for a 50-gram quantity of heroin made by SANCHEZ. Later on October 2nd at approximately 6:57 p.m., SANTIAGO called SANCHEZ and asked him if he was home. SANTIAGO asked him to open the door for him. Surveillance observed SANTIAGO's minivan at SANCHEZ's residence at 270 Fairmount Street, Fitchburg, Massachusetts at and around this time. Based upon the interceptions and surveillance, the agents believe that SANCHEZ contacted SANTIAGO on October 1st and 2nd to purchase a 50-gram quantity of heroin and that SANTIAGO delivered same to SANCHEZ at his residence on October 2nd.

76.    On October 7, 2004 at approximately 11:51 a.m., SANTIAGO using Target Telephone 3 called SANCHEZ. SANTIAGO told SANCHEZ to tell him because he was going. SANCHEZ said yes and that he forgot to call SANTIAGO. SANCHEZ explained that he was waiting for his cousin, but he didn't bring it. SANTIAGO told SANCHEZ to forget about him then and told SANCHEZ to page him with the time that they are going to meet. A few minutes later, at approximately 11:55 a.m., SANTIAGO on Target Telephone 3 received a call from SANCHEZ. SANCHEZ told him "it's the two." SANTIAGO indicated that he did not understand and asked if

32

"the two guys are going there" which SANCHEZ then confirmed. SANTIAGO then told SANCHEZ that he received the call. At approximately 11:59 a.m., there had been a page of "250" to the Target Pager. Based upon the interceptions and the investigation to date, I believe that SANTIAGO was going to retrieve or obtain a quantity of heroin for SANCHEZ but was waiting for SANCHEZ's order; SANCHEZ indicated that he was waiting for someone ("his cousin") to bring the money for the drug transaction; and SANTIAGO told him to page him with the "time" (meaning the quantity of heroin that he wanted). SANCHEZ called back and indicated "it's the two" (meaning a quantity of heroin for him and "his cousin"). SANTIAGO's acknowledgment that he had received the call was a reference to the "250" page that he had received via the Target Pager (meaning that SANCHEZ wanted 250 grams of heroin).

**Heroin sales from SANTIAGO to AGOSTO**

77.    On July 1, 2004 at approximately 4:34 p.m., an incoming call to SANTIAGO from AGOSTO was intercepted over Target Telephone 2. During the intercepted coded conversation AGOSTO asked SANTIAGO if SANTIAGO could pay AGOSTO a visit. They agreed to meet early the next day. SANTIAGO asked AGOSTO how much he needed. AGOSTO replied "sixty." SANTIAGO asked if it was only 60 pesos. AGOSTO replied in the affirmative. SANTIAGO asked AGOSTO to get it from the same "money order." SANTIAGO said that it was all going to be in the same money order and that they would talk later on. SANTIAGO advised AGOSTO that he would call him later that night.

78.    At approximately 4:49 p.m. on that same date another incoming call to SANTIAGO from AGOSTO was intercepted over Target Telephone 2. During that conversation AGOSTO told SANTIAGO that 'this one' called him and asked if SANTIAGO could get "him" an additional "money order" for $16.00. SANTIAGO asks if the $16.00 was separate from the $60.00 "money order." AGOSTO replied in the affirmative. They agreed that SANTIAGO would call AGOSTO at 6:00 a.m. the following day July 2, 2004.

79.    On July 2, 2004 at approximately 7:46 a.m., an incoming call to SANTIAGO from AGOSTO was intercepted over Target Telephone 2. During that call SANTIAGO asked AGOSTO

33

if he was ready to go to the "beach." SANTIAGO told AGOSTO to get ready because SANTIAGO is waiting for AGOSTO to go to the "beach." SANTIAGO instructed AGOSTO to take the right amount of money for the "parking." SANTIAGO insisted that AGOSTO calculate how much and bring the right amount of money.

80.     On July 2, 2004 at approximately 7:47 am Sgt James Trudell observed SANTIAGO exit the second floor left side apartment, of 264 Mechanic Street as viewed from 7th Street. Sgt Trudell then observed SANTIAGO drive out of the driveway of 264 Mechanic Street in the SANTIAGO minivan. Surveillance officers then followed SANTIAGO directly to Lowell where surveillance lost him in the area of the River Place apartment complex at approximately 8:20 a.m. At approximately 8:15 a.m. an outgoing call from SANTIAGO to AGOSTO was intercepted over Target Telephone 2. During that call SANTIAGO told AGOSTO he was about to leave town. AGOSTO asked SANTIAGO to meet him at Josefina's house, AGOSTO's little sister. During further conversation SANTIAGO told AGOSTO to start walking over there. Surveillance was able to locate SANTIAGO at approximately 9:05 a.m. He was alone and was not observed traveling to the beach.

81.     Based upon SANTIAGO's practice of using monetary amounts as a code to describe quantities of heroin, I believe that in the July 1, 2004 calls, AGOSTO placed two coded orders for heroin with SANTIAGO; one order for 60 grams of heroin followed by another order for 16 grams of heroin. On July 2, 2004, SANTIAGO then delivered the 76 grams of heroin to AGOSTO in Lowell , Massachusetts.

82.     On October 9, 2004, there were a series of calls and pages to the Target Telephone 3 and Target Pager between AGOSTO and SANTIAGO. In one of these calls, SANTIAGO told AGOSTO to put the phone number and the "time" (meaning the quantity of heroin he wanted to buy) on the "card" (meaning the Target Pager) and that they would meet later. About thirty-five minutes later, the Target Pager received a "9369-100" which is the last four digits of a telephone number used by AGOSTO and I believe that "100" refers to a 100-gram order of heroin. At 7:19 p.m, the Target Pager received a page of "978-397-0840-100" which is a phone number used by RODRIGUEZ and

34

I believe that "100" refers to a 100-gram order of heroin. SANTIAGO tried to reach AGOSTO at various numbers including the number above, but to no avail. Then, at approximately 7:23 p.m., SANTIAGO called RODRIGUEZ at 978-397-0840.[8]  In the course of conversation, Rodriguez agreed "when the guy has the luggage (meaning money for heroin) ready to call him (meaning SANTIAGO)."  SANTIAGO further instructed Rodriguez to have him (AGOSTO) call him (meaning SANTIAGO) as soon as possible. At approximately 8:02 p.m., SANTIAGO called the same number on which he previously talked to RODRIGUEZ and talked to AGOSTO. SANTIAGO asked AGOSTO what his problem was.  AGOSTO said that he had the "suitcases" (meaning the money). At approximately 8:45 p.m., surveillance agents observed the SANTIAGO minivan around the corner from TAVO's residence. In a 9:04 p.m. call from SANTIAGO to the same phone number, SANTIAGO again spoke with AGOSTO. SANTIAGO indicated that he had to go and AGOSTO said that he was on his way there (meaning to meet SANTIAGO at TAVO's residence). SANTIAGO asked him if "the guy" (meaning Jose Rodriguez) was giving him a ride to which AGOSTO responded no.  SANTIAGO said that "it is not at your sister's house you hear."  AGOSTO acknowledged that he knew this (indicating that he knew that they were going to meet at TAVO's residence). Surveillance observed AGOSTO arrive and walk down the street toward 212 Wilder Street. At approximately 9:27 p.m., SANTIAGO called the same phone number again. AGOSTO said that he was there and SANTIAGO told AGOSTO that he should come on up (meaning he should come on up to TAVO's apartment that is located on the second floor).

**SANTIAGO'S Drug Transactions With TORREZ**

Mini Self-Storage, 3 Foundry Street, Lowell, MA

83.        On June 30, 2004 at about 10:12 a.m., SANTIAGO placed an outgoing call on Target Telephone 2 to TORREZ at 978-265-0079. SANTIAGO told TORREZ if he needs to go, SANTIAGO would go down "there." TORREZ said yes. TORREZ then told SANTIAGO to take

---

[8]Law enforcement officers had previously seized 60 grams of heroin from RODRIGUEZ's person and his residence on June 6, 2004 after a delivery of SANTIAGO as discussed above.

35

2 of the "good ones for Taylor". SANTIAGO replied they will meet 'over there' and to answer the call. I believe SANTIAGO was going to deliver 2 fingers of heroin to TORREZ.

84.        Based upon the above intercepted conversation, surveillance was stationed at SANTIAGO'S 264 Mechanic Street residence as well as TORREZ's 219 Black Brook Drive residence. At about 11:15 a.m., Sgt. Trudel observed an Hispanic male exit the area of TORREZ'S 219 Black Brook Drive residence and enter a white Dodge Caravan. He left the area. At about 11:20 a.m. surveillance observed SANTIAGO get into the SANTIAGO minivan and drive to Foundry Street, Lowell, MA. He parked the vehicle and entered a set of double white doors at the Mini Self Storage, 3 Foundry Street, Lowell, MA. Several minutes later SANTIAGO exited the storage facility, opened the front passenger door of the blue van and then re-entered the storage facility. At about 12:07 p.m. SANTIAGO and another Hispanic male simultaneously exited the storage facility. SANTIAGO entered the SANTIAGO minivan while the other male entered a white Caravan, subsequently identified as the same white van Sergeant Trudel had observed leaving Black Brook Drive at 11:15 a.m. Both vans departed the area moments later.

85.        On August 19, 2004 at 6:48 p.m. TORREZ called SANTIAGO on Target Telephone 1 but only received Santiago's voicemail. TORREZ left a message asking SANTIAGO to call 'Tim' back because he is leaving on Friday and needed the "title." On August 19, 2004 at 7:21 p.m. SANTIAGO called TORREZ back at 978-265-0079. SANTIAGO apologized to 'Tim' (TORREZ) for not answering TORREZ' call but he was far away. SANTIAGO said he will call TORREZ when he got home. TORREZ told SANTIAGO that he needed "that" because he was going to play down there. SANTIAGO asked if that will be tomorrow afternoon. TORREZ said after five. SANTIAGO said he would call TORREZ early the next day. On August 20, 2004, SANTIAGO receives an incoming call on Target Telephone #1 from TORREZ. SANTIAGO told TORREZ, (Tim), he had been "working." SANTIAGO tells TORREZ he would go to TORREZ'S location around 2 or 3:00. TORREZ reminded SANTIAGO he was leaving at 5:00. SANTIAGO assured TORREZ he would be there long before that. On August 20, 2004 at 2:29 p.m., SANTIAGO called TORREZ. SANTIAGO asked where TORREZ was and then told him to wait for him "there."

36

86.           Based upon the above intercepted telephone conversations surveillance was established at about 2:30 p.m. at the Mini Self-Storage, 3 Foundry Street, Lowell, MA. Upon arrival, Sgt Trudell advised surveillance that two Hispanic males were present at that location. From prior surveillances Sgt. Trudell identified one of the Hispanic males as Edwin TORREZ of 219 Black Brook Drive, Lowell, MA. He observed both TORREZ and the unidentified Hispanic male to be standing by TORREZ'S white Dodge Caravan. (Prior surveillances had observed TORREZ operating the same white Caravan.) At about 2:58 p.m., surveillance agents observed SANTIAGO arrive in the front of the Mini Self-storage, park and exit his van. Surveillance observed that upon exiting his van, SANTIAGO was holding an unknown object in his left hand. SANTIAGO was seen by surveillance meeting with TORREZ and the unknown Hispanic male outside the building where they shook hands. A short time later SANTIAGO and TORREZ were seen by surveillance entering the storage building. The unknown Hispanic male remained outside sweeping. At about 3:03 p.m., surveillance agents observed a 1995 black Hyundai arrive in the parking lot of the self-storage. An individual later identified as PITO, was driving. PITO got out of the Hyundai carrying four Dunkin Donuts coffee cups. PITO entered the same storage building as SANTIAGO and TORREZ. The unknown Hispanic male continued sweeping outside. At about 3:10 p.m., surveillance agents observed PITO enter the Hyundai. At about 3:19 p.m., the unknown Hispanic male and TORREZ were seen getting into the white Caravan. They got out of the van shortly thereafter. At about 3:54 p.m., surveillance observed SANTIAGO return to the SANTIAGO minivan and depart the area. At about 3:59 p.m., surveillance agents followed PITO in the black Hyundai and the white Caravan out of the area of the Mini Self-Storage facility.

87.           On September 1, 2004 at 4:20 p.m., SANTIAGO received an incoming call on Target Telephone 1 from Edwin TORREZ. They exchanged greetings and asked each other why the other had not called. SANTIAGO then asked TORREZ if he should go to the "registry" tomorrow morning to meet up with TORREZ. SANTIAGO asked TORREZ if he should bring TORREZ the "car" and TORREZ said yes. SANTIAGO told TORREZ that the two will talk in the morning. In this call, SANTIAGO used the same coded terminology that he used on June 7, 2004

37

at 6:27 p.m. when he told TORREZ he left $16 with TORREZ to take to the registry. In both instances, I believe SANTIAGO was using the word 'registry' as code for delivering heroin to TORREZ

88.    On September 2, 2004 at 5:53 p.m., TORREZ called SANTIAGO on Target Telephone 1. SANTIAGO asked TORREZ if he wanted to go the "game" in Boston. TORREZ said that his buddy was "practicing" now. SANTIAGO said he thought TORREZ was supposed to go 'there' today. TORREZ asked SANTIAGO if SANTIAGO is coming down now and SANTIAGO said he was waiting for 'that.' SANTIAGO said that he'll have to come down on Sunday or Saturday. TORREZ asked SANTIAGO where they were going to meet if SANTIAGO went today since "that place up there is bad." SANTIAGO asked if there isn't any parking and TORREZ said no. SANTIAGO said he'll call TORREZ when he is around the area. I believe this conversation is about SANTIAGO and TORREZ discussing whether SANTIAGO is going to deliver to TORREZ today and where. I believe the bad place they are talking was the Mini Self-Storage facility on Foundry Street, Lowell, MA.

89.    On September 2, 2004 at 7:03 p.m. SANTIAGO received an incoming call from TORREZ on Target Telephone 1. SANTIAGO told TORREZ that he was waiting for him near the houses where SANTIAGO put the (unintelligible) the last time. SANTIAGO asked if TORREZ remembered and TORREZ affirmed. TORREZ said that he'll come down now and call SANTIAGO. SANTIAGO told TORREZ to come down as soon as possible as he is at someone else's house and he has to leave.

90.    On September 2, 2004 at 7:23 p.m., SANTIAGO received an incoming call from TORREZ on Target Telephone 1. TORREZ asked SANTIAGO if he was there and SANTIAGO said yes, he was still waiting for TORREZ. TORREZ asked if SANTIAGO could come down to TORREZ'S location. SANTIAGO said no, he didn't like it there. TORREZ said that's fine and he'd come up now to meet SANTIAGO. SANTIAGO told TORREZ to hurry as his friend and wife have to leave. At 7:43 p.m., TORREZ called SANTIAGO and told SANTIAGO he was there. SANTIAGO told TORREZ to come in as the guy is working on the "car."

91.         On September 2, 2004, surveillance was established at 212 Wilder Street, Lowell, MA, TAVO'S residence. At about 7:47 p.m. surveillance observed TORREZ'S white Dodge Caravan arrive and park in the driveway of TAVO'S 212 Wilder Street residence. At about 8:08 p.m., surveillance agents observed 2 Hispanic males leaving 212 Wilder Street in the Dodge Caravan. While SANTIAGO was at 212 Wilder Street, TAVO was in the driveway sweeping. When TORRADO arrived and left 212 Wilder Street, TAVO was sweeping the driveway and continued even after TORRADO left. When TORREZ arrived at TAVO'S 212 Wilder Street residence, TAVO was sweeping the driveway, and he continued after TORREZ left the area. It is my belief that TAVO was outside in his driveway sweeping with no purpose other than maintaining surveillance for SANTIAGO'S drug transactions.

**SANTIAGO's Delivery of 10 Grams of Heroin to TORRADO**

92.         At approximately 4:41 p.m. on August 26, 2004, SANTIAGO received an incoming call on Target Telephone 1 from TORRADO at 978-479-2026, listed in TORRADO'S name at 4 Florence Ave., Lowell, Massachusetts. During this intercepted conversation, TORRADO told SANTIAGO he had been waiting for SANTIAGO'S call. TORRADO told SANTIAGO they didn't have to do "it" right now, that it could be later. SANTIAGO asked TORRADO "how many guys are going to go up to the park." TORRADO said "only one right now but that on Saturday, maybe 4 or 5 want to go up." SANTIAGO asked if this guy's friends are going to go over there. TORRADO said he didn't know but he'll call over "there" and find out. SANTIAGO said yes, because he did not want to make a trip and spend gas for no one to go. I understood this conversation to mean that TORRADO wanted one 'finger' of heroin (ten grams) at present but would possibly want 4-5 fingers on Saturday. Based upon previous seizures (see paragraphs 29-37 above), when SANTIAGO refers to "guys", he is talking about 'fingers' of heroin. Pertaining to TORRADO'S friends, SANTIAGO wanted to know if anyone else needed anything while he was meeting with TORRADO because his past actions show that when he travels to Lowell, he distributes to several people.

93.         At approximately 4:48 p.m. on August 26, 2004, SANTIAGO received another

incoming call on Target Telephone 1 from TORRADO (978-479-2026).   TORRADO told
SANTIAGO "he does not need workers for today." TORRADO asks SANTIAGO to "bring him two
of the last workers that this guy had, the jews."    I interpret this conversation to mean that
TORRADO changed his original order of 1 'finger' to 2 'fingers.' At 6:17 p.m. on August 26, 2004,
SANTIAGO received an incoming call from TORRADO.  SANTIAGO told TORRADO to go
where TORRADO'S wife's grandmother used to live, then go into the first parking lot and he'll find
SANTIAGO'S car there.  SANTIAGO tells TORRADO "he'll find the coffee in a garbage bag in
the garbage." TORRADO asked if the 'office' was there. SANTIAGO said "yes." SANTIAGO told
TORRADO he could see it from where he was.  At 6:18 p.m., SANTIAGO placed an outgoing call
to TORRADO.  SANTIAGO asked if TORRADO found "it."  TORRADO said yes, "he found a
coffee one." SANTIAGO asked if TORRADO "left the car papers there."  TORRADO said he "left
the papers under the driver's seat of Santiago's car, that he put it in a little hole in the corner."
TORRADO asked if there is 1 or 2 and SANTIAGO said TORRADO told him one.  TORRADO
told SANTIAGO he told him 2.  SANTIAGO said "he owes him the other one and that he'll give
it to him early tomorrow morning."  SANTIAGO told TORRADO he can't go 'there' again.
TORRADO said he already had 'them' reserved for someone.  I understood these conversations to
mean that SANTIAGO left the 'finger' of heroin in a garbage bag in his van(office).  After
confirming that TORRADO found the heroin, SANTIAGO asked if TORRADO left the money.
TORRADO then explained to SANTIAGO where he put the money.

94.    Based upon the above succession of conversations, as well as others throughout the
day, surveillance was established on SANTIAGO at 5:57 p.m. on Foundry Street, Lowell,
Massachusetts.  SANTIAGO was followed to the area of Black Brook Drive and Rosewood Lane,
Lowell, Massachusetts where he parked in the "Redwood Terrace" housing complex. He was seen
by surveillance agents getting out of the van and entering 427 Rosewood Lane (subsequently
identified as the residence of PITO).  At about 6:19 p.m., surveillance observed TORRADO enter
Rosewood Lane in a white 1993 Buick sedan.  TORRADO parked his vehicle next to the
SANTIAGO minivan and exited. TORRADO then entered Santiago's van on the driver's side where

he stayed for about 20 seconds. TORRADO was observed by surveillance agents exiting Santiago's mini-van carrying a white coffee cup. He returned to his vehicle where he remained for about 1 minute before departing the area.

95.    TORRADO was followed by surveillance agents through Lowell, Massachusetts. It became apparent to surveillance agents that TORRADO became aware of surveillance following him as his speed increased and he made several quick turns to evade them. TORRADO was stopped at about 6:31 p.m. by a uniformed Lowell Police Department officer. While TORRADO was being questioned, Detective Figueroa of the Lowell Police Department observed Reynaldo RIVERA drive by TORRADO. A search of TORRADO and his vehicle were performed with negative results. TORRADO was released. Detective Figueroa retraced TORRADO'S route prior to being stopped and located a McDonald's coffee cup which contained a hard cylinder object wrapped in gray duct tape further containing compacted tan powder. The tan powder was later field tested which generated a positive reaction for heroin.

96.    At 6:36 p.m. on August 26, 2004, SANTIAGO, utilizing Target Telephone 1, called RIVERA on the Rivera cell phone. RIVERA told SANTIAGO that "there were problems with the 'car' and to be careful not to come around." SANTIAGO asked what RIVERA meant by problems. RIVERA again told SANTIAGO not to go by, otherwise "he may end up on foot." RIVERA told SANTIAGO "the car stalled." SANTIAGO asked if he meant the "guy" and RIVERA said yes. SANTIAGO asked when this happened and RIVERA said "just now but that the guy is okay, didn't get hurt." SANTIAGO asked if the guy is okay. RIVERA said yes, but "the guy ended up on foot." SANTIAGO said he still did not understand RIVERA but it was okay. At 8:06 p.m. SANTIAGO called RIVERA and asked if "this guy" is fine. RIVERA said he was fine but that he lost the "car." RIVERA said he was with 'him' and that everything went well. SANTIAGO said he was worried. RIVERA said it's something to worry about but that everything is fine. SANTIAGO asked RIVERA to have 'him' call him if anything. I interpret this call to mean RIVERA called SANTIAGO to alert him to the fact that TORRADO had been stopped. TORRADO was not arrested but he did not have the 'finger' of heroin (car).

41

97.    At 8:50 p.m. on August 26, 2004 SANTIAGO, utilizing Target Telephone 1, called TORRADO at 978-479-2026.    TORRADO told SANTIAGO he had an 'accident' and if SANTIAGO knows what he's talking about.  TORRADO told SANTIAGO that the accident was on Broadway Street.  TORRADO did not understand how come it happened.  SANTIAGO asked if TORRADO passed a red traffic.  TORRADO said he saw them in the middle of Wilson Street and they started following him.  SANTIAGO said the black car was right behind TORRADO when TORRADO was coming in.    TORRADO said he had never seen that car.    SANTIAGO told TORRADO the black car was there when TORRADO went to get the "papers."  SANTIAGO told TORRADO that he was not going there anymore because "Rey" had told him that further down there is a guy who owns a 'garage' and they are crazy to close the garage.  TORRADO cannot understand how that happened and that he never liked that area. SANTIAGO told TORRADO that he moved from the other 'garage' because it was even more dangerous.  TORRADO kept saying that he never had an accident before, never.    TORRADO is wondering how that could have happened.  SANTIAGO said he's surprised and shocked and complained about his guy having him go to his house.  TORRADO told SANTIAGO to be careful with who SANTIAGO deals because maybe that guy is a rat.  SANTIAGO said that they have to check it out.  SANTIAGO said he doesn't think it was the guy because then PITO would be hurting himself too.

98.    On August 27, 2004 at 12:33 p.m. SANTIAGO received an incoming call on Target Telephone from TORRADO, 978-479-2026.  TORRADO told SANTIAGO he was kind of upset but that it was not SANTIAGO'S fault.  SANTIAGO told TORRADO he'll call him back in 5 minutes.  TORRADO asked SANTIAGO if they are going to be able to do "that."  SANTIAGO said yes.  SANTIAGO told TORRADO he will call him back.  At 1:00 p.m. on August 27, 2004, SANTIAGO received an incoming call from TORRADO.  SANTIAGO said he hasn't called him back because he is "fixing a car," and he would call TORRADO back as soon as he finished. TORRADO asked if SANTIAGO'S minivan is on Wilder Street, near that street where Middlesex comes out.  SANTIAGO says he is not around there.  At 1:18 p.m. on August 27, 2004, SANTIAGO placed an outgoing call to TORRADO.  SANTIAGO apologized for lying to TORRADO earlier.

SANTIAGO told TORRADO he had been here for awhile. SANTIAGO said he has been at his location all morning so TORRADO should just come by there. TORRADO said he was going to look for a ride. SANTIAGO said he was at the top of the stairs near the garage.

99.     At about 9:15 a.m. on August 27, 2004, surveillance was established in the vicinity of TAVO'S 212 Wilder Street residence. At about 9:52 a.m. surveillance agents observed SANTIAGO arrive there in the SANTIAGO minivan. SANTIAGO parked in the driveway. At about 10:14 a.m., surveillance agents observed SANTIAGO walk up the exterior stairs to the second floor of 212 Wilder Street. SANTIAGO placed a small brown paper bag on the chair at the top of the stairs before moving the bar-b-que grill and bending over to retrieve an item from under the grill's wheel. SANTIAGO then picked up the brown paper bag, opened the front door to the second floor apartment using the keys and entered the apartment. At approximately 12:57 p.m. surveillance agents observed TORRADO driving around the area of 212 Wilder Street in his silver Toyota Matrix. At about 1:44 p.m. surveillance agents saw TORRADO walk from Burlington Street into the driveway of 212 Wilder Street. TORRADO was seen walking up the rear exterior stairs to Pedro Alberto Miranda's (a/k/a TAVO) apartment and enter through that door. Surveillance saw a purple Geo Tracker occupied by a female parked in the lot of an apartment complex on Burlington Street, across from 212 Wilder Street. At about 1:55 p.m. surveillance agents observed TORRADO exit the same door he had entered earlier, walk down the stairs and out towards Wilder Street.

100.    On September 1, 2004 at 6:42 p.m. SANTIAGO received an incoming call. TORRADO spoke to SANTIAGO and told him the number he is calling from is strange because he is calling with a calling card. TORRADO said that tomorrow is a sure thing as he just talked to the people who are going to pay him for the "tickets" for the game on Saturday. SANTIAGO told TORRADO to call him tomorrow in the afternoon. TORRADO added that "5 or 6 guys who want to play will go up there tomorrow." TORRADO said he'll call SANTIAGO tomorrow to let him know for sure about these "guys."

101.    On September 2, 2004 at 4:55 p.m. SANTIAGO received an incoming call on Target Telephone 1 from 978-509-3195, subscribed to Carmen Negron at 243 Moody Street, Lowell,

43

Massachusetts. TORRADO greeted SANTIAGO and asks if they are going to "play" today. TORRADO wants to "play" around 7:00. SANTIAGO said he'll be around there later on. TORRADO states that "five (5) guys want to play". SANTIAGO said this is good and agreed to call TORRADO. I believe TORRADO to be ordering 5 fingers of heroin (50 grams) from TORRADO. TORRADO referred to the fingers as "guys", which is the same terminology as RIVERA uses when ordering from SANTIAGO.

102.    On September 2, 2004 at 7:04 p.m. SANTIAGO placed an outgoing call to TORRADO at 978-479-2026. SANTIAGO told TORRADO that he is waiting for TORRADO at the same place where TORRADO went before.

103.    At about 6:55 p.m. surveillance agents observed SANTIAGO to be in the vicinity of TAVO's 212 Wilder Street residence. At about 7:04 p.m. surveillance saw SANTIAGO park his mini-van in the driveway of 212 Wilder Street. At approximately 7:28 p.m. TORRADO was seen by surveillance arriving and parking on Burlington Street, Lowell, MA (one block away from the Wilder Street residence). TORRADO walked to the driveway of 212 Wilder Street. At 7:37 p.m. TORRADO was observed by surveillance leaving 212 Wilder Street.

104.    On September 2, 2004 at 7:44 p.m. SANTIAGO received an incoming call from TORRADO, 978-479-2026. SANTIAGO asked TORRADO if everything is okay and TORRADO said everything is fine.

105.    During an intercepted call over Target Telephone 3 at approximately 5:21 p.m. on September 30th between TORRADO and SANTIAGO, TORRADO asked SANTIAGO if he was still alive. SANTIAGO said that he was stuck in traffic in Worcester and he would call TORRADO. SANTIAGO said that after going to a town up there then he would call TORRADO and asked him if it was for sure. TORRADO indicated that it was and that it was for other people. SANTIAGO told TORRADO to tell those people to take it easy. TORRADO replied that he had been waiting all day. SANTIAGO replied that the afternoon was not over yet and not to worry that SANTIAGO would call TORRADO back. In a 6:18 p.m. call that SANTIAGO made to Reynaldo RIVERA, SANTIAGO asked RIVERA if "he was up in the hill." RIVERA indicated that he was and

44

SANTIAGO asked RIVERA if he could leave "some food in there for that guy." RIVERA replied that it was "no problem." A few minutes later, at approximately 6:19 p.m., SANTIAGO called TORRADO and asked if TORRADO was ready. TORRADO indicated that he was ready and SANTIAGO told TORRADO "to go up there to the hill." Right after this call, surveillance saw TORRADO as he was talking on his telephone while standing by his vehicle near his residence at 241 Moody Street, Lowell, Massachusetts. A few minutes later, SANTIAGO called RIVERA and told RIVERA to open the door.

106.    Surveillance observed SANTIAGO's minivan arrive in the area of RIVERA's residence at 235 Eighteenth Street, Dracut, Massachusetts in this time frame. Shortly thereafter, at approximately 6:33 p.m., SANTIAGO received a call from TORRADO. In this call, SANTIAGO told TORRADO that he was at the man's house. TORRADO replied that SANTIAGO had told him at the hill. SANTIAGO clarified that he meant "at the hill of your friend." TORRADO replied that he was going there. Shortly after the intercepted call with SANTIAGO, surveillance observed TORRADO leave the area of his residence on foot. Surveillance was not able to keep sight of him. Although surveillance lost sight of TORRADO, based upon the intercepted calls and the surveillance of SANTIAGO, the agents believe that TORRADO may have walked to another vehicle and driven to RIVERA's residence (which is located in an apartment complex where numerous unidentified vehicles were seen arriving in the time frame that TORRADO was expected). Based upon the sequence of calls between SANTIAGO, RIVERA and TORRADO and surveillance, I believe that TORRADO ordered a quantity of heroin from SANTIAGO for some customers ("other people") and that SANTIAGO arranged to make the delivery of the drugs to RIVERA's residence and for TORRADO to meet him there.

**SANTIAGO's Dealings with TAVO**

107.    On July 11, 2004, at approximately 5:46 p.m. SANTIAGO used Target Telephone 2 to call TAVO on Target Telephone 4. SANTIAGO asked TAVO to call TAVO's friend, because SANTIAGO "has to go over there." TAVO told SANTIAGO that his "friend" had just called.

45

SANTIAGO told TAVO that he was planning to go "over there," where TAVO's friend and SANTIAGO's friend were. TAVO told SANTIAGO, that he would beep (page) him and put in his "friend's" phone number, so that SANTIAGO could call TAVO's friend. SANTIAGO told TAVO to talk to TAVO's friend to make sure the latter received SANTIAGO's call. Based on cell site information for Target Telephone 2, agents knew that SANTIAGO went to New York on July 12, 2004. Therefore, in this conversation, I believe that SANTIAGO wanted to arrange to meet with TAVO's source of supply (TAVO's friend) while in New York, and that he was asking TAVO for the "friend's" number and for TAVO to let his "friend" know that SANTIAGO would be calling.

108.    On August 27, 2004, at approximately 5:51 p.m., TAVO used Target Telephone 4 to call SANTIAGO on Target Telephone 1. TAVO and SANTIAGO discussed various things. Later in the conversation, SANTIAGO told TAVO that he had gone there (to TAVO's residence) and had "left some papers" in the room that TAVO was painting. SANTIAGO told TAVO that he had done so, because TAVO had told SANTIAGO earlier that there were police around there ready to give SANTIAGO a "ticket." SANTIAGO also told TAVO that he had left TAVO's house on foot, and that the police had followed him. SANTIAGO repeated that he left the "papers" in the closet behind the stereo, behind some shoes. TAVO replied that it was "no problem" because he was going there right away. Based on my training and experience, and other intercepted conversations, I believe that when SANTIAGO said "papers," he was actually referring to drugs or drug proceeds that he had left at TAVO's house.

109.    On September 2, 2004, at approximately 5:54 p.m., SANTIAGO used Target Telephone 1 to call TAVO on Target Telephone 4. SANTIAGO told TAVO that he wanted to go there (to TAVO's location) to "fill out some papers." TAVO agreed. SANTIAGO advised TAVO that it "may take sometime." Surveillance agents observed SANTIAGO arrive at TAVO's residence at approximately 7:04 p.m. SANTIAGO remained at TAVO's residence until approximately 8:34 p.m. During this time period, SANTIAGO arranged via Target Telephone 1 for several of the other Target Subjects to meet him there, including TORRADO, TORREZ, and RODRIGUEZ. Agents were able to observe as each of these individuals came and left. They also observed TAVO in his

46

drive way looking around in a manner consistent with a look-out. Based on the investigation to date and the experience of the case agents, I believe that SANTIAGO made several narcotics sales from TAVO's residence with TAVO's knowledge, while TAVO acted as a look-out.

110.    On October 3, 2004 at approximately 2:40 p.m., TAVO (calling from 978-996-5744, a telephone that is not Target Telephone 4) called SANTIAGO on Target Telephone 3. In the course of this conversation, SANTIAGO told TAVO that he tried calling him at his number but that no one answered. TAVO replied that the phone was turned off and that he had taken the battery out and hadn't put it back in. Later in the conversation SANTIAGO told TAVO that he was there at Roger's (SANTIAGO's brother's house) near TAVO's house. TAVO asked SANTIAGO what time he was going to come by and SANTIAGO told TAVO that he was just calling to see how TAVO was doing. At the end of the conversation, TAVO told SANTIAGO that he could stop by and that TAVO had "the key to the car that he needed." SANTIAGO said that he would stop by. SANTIAGO then asked TAVO if he should call TAVO back at this same number. TAVO told SANTIAGO that he could call the other phone since TAVO was going to put the battery back in. TAVO told SANTIAGO that he could call either phone. Later that day at approximately 3:31 p.m., SANTIAGO (on Target Telephone 3) called TAVO on Target Telephone 4. In the course of this conversation, it was clear that the two were planning to meet. SANTIAGO asked TAVO if he can come over "if the coast is clear." TAVO replied that it was clear, that he looked but hasn't gone back outside, but he was going over. SANTIAGO told TAVO that he was parking around the corner. The GPS device on SANTIAGO's minivan revealed that he was on West Adams Street in Lowell which is around the corner from TAVO's residence at this time. I believe that the "keys to the car" is a reference to a quantity of money or drugs.

**During the Course of This Investigation, SANTIAGO has Made Numerous Trips to Brooklyn, NY To Obtain Heroin**

111.    In the past few months, SANTIAGO regularly travels to 930 59th Street, Brooklyn, New York. Based upon intercepted calls, the nature and frequency and timing of his trips there, I believe that SANTIAGO is obtaining heroin from a source of supply located at this address.

47

112. On September 15, 2004, SANTIAGO received a telephone on Target Telephone 3 from 718-598-5109 subscribed to by Jose Perez, 12s241 39th Street, Brooklyn, New York at 10:33 p.m. The call lasted approximately 1:06 seconds. (I note that DEA was not intercepting Target Telephone 3 at this time). The following day, September 16, 2004, the GPS device on the SANTIAGO minivan indicated that SANTIAGO left his residence in Leominster at approximately 9:57 p.m. and traveled to 930 59th Street in Brooklyn, New York. Although there was no surveillance conducted of this trip, the GPS device indicated that the SANTIAGO minivan stayed at this location for approximately five hours before leaving at 2:53 a.m. and returning to SANTIAGO's Leominster residence at approximately 6:33 a.m.

113. On September 27, 2004, the GPS device on the SANTIAGO minivan left his Leominster residence at approximately 10:20 a.m. and arrived at 930 59th Street, Brooklyn, NY at approximately 1:45 p.m. Surveillance at this location observed SANTIAGO arrive in the SANTIAGO minivan and enter the 59th Street residence. According to pen register data on Target Telephone 3, SANTIAGO called a pager, (917) 500-8132 (subscriber information is still unknown) at 1:47 p.m. and then received an incoming call at 1:49 p.m. from the same telephone number, 718-598-5109 that he had been contacted by on September 15th. (Again at this time, DEA was not intercepting Target Telephone 3). At approximately 3:00 p.m., surveillance saw SANTIAGO and an unknown Hispanic male leave the residence and enter the SANTIAGO minivan which was parked in front of the building. Prior to the two getting into the van, a gym bag was taken out of the back of the van . While SANTIAGO and the unknown male were in the SANTIAGO minivan, a taxi arrived and dropped off an unidentified Hispanic female. The unknown Hispanic male got out of the SANTIAGO minivan and paid the female's cab fare. At this time, SANTIAGO, the unidentified man and woman went into 930 59th Street. Later that day, surveillance saw unknown male and female and a young child leave the address and go to the subway that was enroute to Manhattan. Surveillance did not follow them, but they returned to this address several hours later. Surveillance of the location continued until approximately 8:30 p.m. During this time, SANTIAGO was not seen

48

leaving the address. The GPS device showed that SANTIAGO's minivan left Brooklyn, New York at approximately 3:00 a.m. and arrived back at his Leominster residence at approximately 6:35 a.m. According to pen register data on Target Telephone 3, SANTIAGO received an incoming call from 718-598-5109 at approximately 11:48 a.m. on September 28, 2004 and made an outgoing call to the same number at approximately 1:42 p.m. The following day, September 29th, the day before interception on Target Telephone 3 began, SANTIAGO received another incoming call form this number that lasted 2 minutes and 39 seconds.

114.    Earlier this month, SANTIAGO was again in touch with an unidentified individual at the same Brooklyn telephone number, 718-598-5109. In a October 6, 2004 call at approximately 3:26 p.m., an unidentified mall complained to SANTIAGO about SANTIAGO not calling him. In the course of this conversation, SANTIAGO asked him if he was "done with the factory job." The male indicated that he was, more or less, and that he may be leaving for Santo Domingo the following day (meaning that he was going to his drug supplier the following day) . The male asked SANTIAGO if he was going to travel and SANTIAGO said that he was going to see if he could get some vacation so he could go to Santo Domingo as well (meaning whether SANTIAGO was going to visit his supplier and SANTIAGO indicating that he was going to do so). At the end of the conversation, SANTIAGO said that he would call the caller sometime this week if he decided to go to Santo Domingo (meaning go to his supplier). Although there was no surveillance of this trip, the GPS device on SANTIAGO's minivan showed that he traveled to 930 59th Street in Brooklyn, New York on October 7, 2004 and then returning early the following morning to his residence in Leominster. Two days later (October 8, 2004) at approximately 1:02 p.m., SANTIAGO received a telephone call from the same caller from same number, 718-598-5109. SANTIAGO asked caller if everything was fine. Caller replied that everything was fine. In the course of this conversation, SANTIAGO said that "the trip went well for him."

115.    Based on my training and experience, I know that New York City is a source city of heroin for drug-traffickers in the New England area generally and in Massachusetts in particular.

49

Moreover, the manner in which Santiago's minivan was driven to Brooklyn on each of these occasions: it was driven non-stop down to Brooklyn, New York and approximately three hours non-stop back from in the middle of the night and remained at its apparent destination for less than a day and then returns to SANTIAGO's 264 Mechanic Street residence-- combined with the fact that SANTIAGO uses only the minivan when transporting heroin to his customers makes it likely that the minivan was driven on these occasions to take delivery of and to transport back to Massachusetts a quantity of heroin for re-distribution by SANTIAGO.

116.    Earlier today (October 14, 2004), the GPS device showed that the SANTIAGO minivan drove from Massachusetts to New York. Surveillance observed SANTIAGO arrive at 930 59th Street in Brooklyn, New York at approximately 2:00 p.m. Yesterday, there was an intercepted call between SANTIAGO and the caller from 718-598-5109. SANTIAGO told the caller that he would visit "early in the weekend."

## III. PROBABLE CAUSE FOR SEARCH WARRANTS FOR TARGET LOCATIONS

### DRUG TRAFFICKERS' USE OF RESIDENCES GENERALLY

117.    I have participated in the execution of numerous search warrants at the residences of drug-traffickers such as the targets of this investigation. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following kinds of drug-related evidence have typically been recovered:

a.    controlled substances, such as heroin;

b.    paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

c.    books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

d.    personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

e.    cash, currency, and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys, as well as precious metals such as gold and silver, and precious gems such as diamonds and deeds to real property;

50

)

f.    documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills; and

g.    firearms and other dangerous weapons.

118.    In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

119.    Based upon my training, experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers experienced in narcotics and money laundering investigations, I know the following:

a.    Narcotics traffickers find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system.

b. Narcotics traffickers frequently maintain large amounts of cash and other valuable assets such as precious metal or gems on hand in order to maintain and finance their ongoing business.

c. Narcotics traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders and other documents relating to the transportation, ordering, sale and distribution of controlled substances and monetary instruments and other assets. Such documents are generally maintained where the narcotics traffickers have ready access to them, such as at their residences or other locations where they regularly conduct their narcotics business.

d. It is common for significant narcotics traffickers to hide contraband, proceeds of drug sales, records of drug transactions, weapons, ammunition, caches of drugs, large amounts of currency, financial instruments, keys for safe deposit boxes, precious metals, jewelry and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences for ready access and to conceal them from

51

law enforcement authorities.

e. When narcotics traffickers amass proceeds from the sale of controlled substances, they commonly attempt to legitimize those profits. Narcotics traffickers use various means for these purposes, including but not limited to foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations and business fronts.

f. Narcotics traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, telephone numbers and/or paging numbers for their criminal associates. They also tend to maintain for long periods of time telephone billing records that evidence the placing of large numbers of calls each month in connection with narcotics dealing.

g. Narcotics traffickers commonly have photographs of themselves, their associates, their property and their products in their possession or in their residences.

h. To evade surveillance and law-enforcement tracking through Registry of Motor Vehicle Records, narcotics traffickers also frequently rent vehicles and maintain records of such rentals at their residences.

i. Narcotics traffickers usually keep paraphernalia for packaging, cutting, weighing and distributing controlled substances. These paraphernalia include but are not limited to scales and packaging materials.

j. Narcotics traffickers maintain many associated apartments from which they conduct their business, such as mills or "stash" houses. Narcotics traffickers frequently maintain records and other documents that evidence rental or lease agreements for such apartments. These documents constitute evidence of the association of the various apartments, which, itself, is a tool of the narcotics conspiracy. Drug traffickers frequently maintain such records in their residences.

k. Narcotics traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, containers, safe-deposit boxes and other instruments, which are further secured by combination and/or key locks of various kinds.

l. Narcotics traffickers frequently build "stash" places within their residences or other

52

locations in order to store illicit narcotics substances as well as the items described above.

m. Narcotics traffickers frequently hire motor vehicles from rental companies and car services to transport narcotics and elude surveillance.

n. Narcotics traffickers frequently use fronts through which they are able to declare a source of employment and legitimate income, obtain credit, provide company names and addresses in which to register real property and other assets, launder narcotics proceeds, and accept or make shipments of narcotics and/or narcotics proceeds.

o. Courts have recognized that unexplained wealth is probative evidence of crimes motivated at least in part by greed, in particular, trafficking in controlled substances.

120. Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth hereinafter, I believe that SANTIAGO, TAVO, SANCHEZ and RIVERA, like many drug traffickers, have used their residences in furtherance of their drug trafficking activities, and that evidence regarding those activities, including, but not limited to, cash, drugs, drug ledgers, and other tools of the drug trade will be found in each of their residences.

### DRUG TRAFFICKERS' USE OF "STASH LOCATIONS" GENERALLY

121. It has been my experience that drug traffickers use "stash locations" for their drugs, in order to avoid keeping large quantities of the drugs in their residences. Stash locations also provide some measure of security for drug traffickers, who are concerned about being robbed. Stash locations provide privacy so that traffickers can break down and package the drugs, often with assistance from associates, at a location away from their homes and families. A stash location also provides some anonymity for the delivery of bulk drugs; in this way, a drug trafficker can receive a shipment of drugs without letting the courier (or other members of the supply organization) know where he or she lives.

### THE TARGET LOCATIONS

122. Recent interceptions (and/or surveillance conducted in relation to some of these interceptions) reveal, among other things, that SANTIAGO is still communicating and/or meeting

53

with numerous heroin customers to provide heroin to them; that TAVO is still allowing SANTIAGO to meet at his residence to meet with heroin customers; and that, today, SANTIAGO has traveled to Brooklyn, New York in what is believed to be, based upon his past trips there and intercepted calls regarding same, a trip to obtain heroin from a source of supply.

### RIVERA'S 235 Eighteenth Street residence

123.  As discussed above, RIVERA resides at this location and has been surveilled on numerous occasions meeting with SANTIAGO in the parking lot of this residence in what are believed to be deliveries of heroin to RIVERA by SANTIAGO and/or deliveries of money to SANTIAGO by RIVERA. On several occasions, RIVERA was observed returning to his residence after these meetings.  Most recently, on October 13, 2004, there was a page of "423-14" to the Target Pager at 1:17 p.m. (the first three numbers are the first three numbers of RIVERA's telephone number and I believe that 14 was a reference to 14 10-gram fingers of heroin). At 1:21 p.m., there was an intercepted call between RIVERA and SANTIAGO in which SANTIAGO was confirming this order and they agreed to meet later.

124.  At around 9:55 p.m., surveillance observed the SANTIAGO minivan showed that SANTIAGO's minivan traveled to RIVERA's 235 Eighteenth Street residence.  Surveillance at RIVERA's residence observed SANTIAGO arrive in SANTIAGO's minivan and he went into RIVERA's 235 Eighteenth Street residence.  SANTIAGO remained inside for approximately two minutes and then returned to the SANTIAGO minivan and then departed the area.[9]  Based upon the interceptions and surveillance, I believe that SANTIAGO delivered 14 fingers of heroin to RIVERA on this occasion.

125.  Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the 235 Eighteenth Street residence

---

[9]Although DEA had received information earlier in this investigation from a confidential informant that RIVERA had used another residential location as a stash location and then later had used a motel room in Tewksbury, Massachusetts as a stash location, the more recent surveillance of RIVERA reveals that he is receiving heroin deliveries from SANTIAGO at this residence.

54

presently contain the items set forth in Attachment B-1 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that RIVERA keeps, among other things, drug proceeds in this residence, as well as narcotics and documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

### SANTIAGO's 264 Mechanic Street residence

126. As discussed above, SANTIAGO has traveled to and from this location to make deliveries of heroin to customer and/or to collect money for heroin from them on numerous occasions. For example, recently on October 9, 2004, surveillance observed SANTIAGO travel in Santiago minivan from SANTIAGO's 264 Mechanic Street, Leominster address to TAVO's 212 Wilder Street, Lowell residence for AGOSTO who had ordered heroin in previously intercepted calls that day. Today (October 14, 2004), SANTIAGO traveled directly from this residence to 930 59th Street, Brooklyn, the location from which there is probable cause to believe SANTIAGO is receiving heroin.

127. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the 264 Mechanic Street residence presently contain the items set forth in Attachment B-2 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that SANTIAGO keeps, among other things, drug proceeds in the this residence, as well as narcotics and documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

55

### SANCHEZ'S 270 Fairmount Street residence

128. On numerous occasions, surveillance has observed (or the GPS device has shown) that SANTIAGO has traveled to SANCHEZ's 270 Fairmount Street residence after intercepted calls and pages indicating that SANCHEZ was ordering a quantity of heroin from SANTIAGO. Most recently, on October 7, 2004 surveillance observed SANTIAGO travel to SANCHEZ's 270 Fairmount Street residence after a series of intercepted calls about arranging to meet and an intercepted page ("250", referring to a 250-gram quantity of heroin) between SANTIAGO and SANCHEZ. On this occasion, as in past occasions, there is probable cause to believe that SANCHEZ ordered a quantity of heroin and that SANTIAGO delivered it to him at SANCHEZ's 270 Fairmount Street residence.

129. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the 264 Mechanic Street residence presently contain the items set forth in Attachment B-3 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that SANCHEZ keeps, among other things, drug proceeds in the this residence, as well as narcotics and documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

### Mini-Self Storage, 3 Foundry Street, Lowell, Massachusetts

130. On numerous occasions, surveillance has observed SANTIAGO and TORREZ meet at this location after intercepted calls and/or pages in which TORREZ, in coded language, ordered a quantity of heroin. Most recently, on October 9, 2004, there were intercepted calls between SANTIAGO and TORREZ about meeting the next day. Later that day, however, the GPS device on SANTIAGO's minivan revealed that it had traveled to the Mini Self-Storage location and had remained there approximately seven minutes.

56

131. As discussed above, Mini Self Storage is a location that TORREZ has recently been using as a stash location for items related to his drug trade. I and other law enforcement agents have conducted surveillance at this location on numerous occasions and have observed SANTIAGO arrive and depart from this location on numerous occasions and meet with certain customers there.

132. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at Mini-Self Storage presently contain the items set forth in Attachment B-5 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that SANTIAGO keeps, among other things, drug proceeds in the this residence, as well as narcotics and documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

### TAVO'S 212 Wilder Street residence

133. As discussed above in Paragraphs 107 through 110, surveillance and intercepted calls between SANTIAGO and TAVO show that there is probable cause to believe that SANTIAGO has left money and/or drugs at TAVO's residence and that TAVO has allowed SANTIAGO to meet with various customers to deliver heroin. On the most recent occasion on October 9, 2004 (as discussed further above in paragraph 82), SANTIAGO arranged to meet with AGOSTO at TAVO's residence for what there is probable cause to believe was a heroin transaction.

134. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the 212 Wilder Street residence presently contain the items set forth in Attachment B-6 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that TAVO keeps, among other things, drug proceeds in

57

the this residence, as well as narcotics and documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

### SANTIAGO'S minivan

135.  As discussed above, SANTIAGO has used the SANTIAGO minivan on many occasions to make deliveries of heroin to customers, to retrieve heroin from a source of supply in Brooklyn, New York and otherwise to facilitate his heroin trafficking. In fact, he traveled to Brooklyn, New York today (October 14, 2004) in the SANTIAGO minivan to the location from which, based upon the investigation to date, he will retrieve a supply of heroin.

136. Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the Santiago minivan presently contain the items set forth in Attachment B-7 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that SANTIAGO keeps, among other things, drugs, money, and documents and papers relating to his drug customers and his source of supply and relating to his travel to New York to his source of supply.

### IV. CONCLUSION

137.    Based on all the foregoing, I submit there is probable cause to believe **JULIO CARRION SANTIAGO, a/k/a "MACHO," PEDRO ALBERTO MIRANDA, a/k/a "TAVO," REYNALDO RIVERA, a/k/a "REY", JOSE RODRIGUEZ, ENRIQUE AGOSTO, JOSE TORRADO, CARLOS SANCHEZ, a/k/a "CARLITOS," LUIS R. SANCHEZ, a/k/a "PITO," EDWIN TORREZ, a/k/a "COQUI, a/k/a TIM," ZULEIMA REYES, a/k/a "LINDA," and SANTIAGO ARROYO** have conspired to possess with intent to distribute and to distribute 100 grams or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. §846 and that evidence of the commission of this

58

criminal (see contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846 will be found at the Target Locations.

Dated this day of October ___, 2004.

CALICE COUCHMAN
Special Agent, United States
Drug Enforcement Administration

Sworn to and subscribed to before me in Boston, Massachusetts, this day of October ___, 2004.

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE

59