**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | CRIMINAL NO.: 04-10336-NMG |
| v.                      ) | |
| ) | |
| JULIO SANTIAGO, et al.  ) | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SEVER**

The United States, by and through the undersigned attorney, opposes the defendant's Motion to Sever Count One from Counts Seven and Eight in the above-referenced matter.  The defendant has failed to show any good reason to sever the various counts included in the indictment against him.  Because all of these counts are closely related in time, place and proof, (in fact, the evidence presented by the government for Count One would be identical to that for Counts Seven and Eight at separate trials), they should be tried together and the motion to sever should be denied.

FACTUAL STATEMENT

On April 13, 2005, a federal grand jury returned a Superseding Indictment charging Julio Carrion Santiago ("Santiago") with the following offenses: Count One, Conspiracy to Possess with Intent to Distribute Heroin with eleven others from December 2003 to October 15, 2004; Count Seven, Possession of Firearms (a 9mm Luger handgun and three silencers) in Furtherance of a Drug Trafficking Crime on October 15, 2004; and

1

Count Eight, Possession of Unregistered Firearms (three silencers) on October 15, 2004.

The conspiracy charge (and the other charges in the Indictment in which Sanchez is not named) arise out of a long-term investigation conducted by agents and officers of the Drug Enforcement Administration ("DEA") and other law enforcement agencies.  A fuller summary of this investigation is contained in the government's opposition to the motions to suppress of co-defendants Julio Santiago, Pedro Alberto Miranda (a/k/a Carlos Colon) and Edwin Torres, filed on June 6, 2005, and the government's opposition to Luis Sanchez's motion to suppress evidence obtained pursuant to court-authorized wiretaps, filed on June 27, 2005.[1]  The government summarizes only so much of the information contained in these documents, which are incorporated herein by reference, that is necessary to address the defendant's severance motion.

**The Wiretap Phase of the Investigation**

At various points since in or about March, 2004 until October 15, 2004, the DEA conducted Title III wiretaps of the telephones of Defendants Julio SANTIAGO, Reynaldo RIVERA, and/or

---

[1] The government's oppositions to motions to suppress cite for factual support the Affidavits of DEA Special Agent Calice Couchman in support of criminal complaints against the co-defendants("Couchman Aff." for the affidavit in support of the October 14, 2004 complaint against Sanchez and ten other co-defendants and "Couchman Aff. II" for the affidavit in support of the October 15, 2004 complaint against co-defendant Juan Nunez).

Pedro Alberto MIRANDA a/k/a TAVO.  The investigation concluded on October 15, 2004 when SANTIAGO left his residence at 264 Mechanic Street in Leominster (where heroin, a handgun and three silencers were found) and traveled to Brooklyn, New York, as he had two times before, to retrieve approximately 500 grams of heroin from a source of supply, Juan NUNEZ.

The wiretap phase of the investigation revealed SANTIAGO to be a substantial heroin dealer with a strong and consistent customer base of mid-level "re-dealers."  Initially, in March 2004, the Court issued an Order authorizing the interception of wire communications occurring over the cell phone for codefendant Reynaldo RIVERA.  Pertinent calls (i.e., calls that were related to drug trafficking) confirmed that Santiago was supplying heroin to RIVERA, id., and, subsequently, the government sought court authorization to intercept wire communications occurring over telephones and a pager used by Santiago as well as a telephone used by codefendant Pedro MIRANDA (a/k/a TAVO).

As summarized in detail in the government's oppositions to motions to suppress described above, all of the defendants, except Juan NUNEZ, Santiago ARROYO, and Zuleima REYES, were significant customer-distributors of SANTIAGO's who were receiving distribution quantities of heroin from SANTIAGO.[2]

---

[2] NUNEZ was SANTIAGO's Brooklyn-based source of supply; ARROYO was a "runner" for codefendant Reynaldo RIVERA who delivered 9.6 grams of heroin to an undercover agent who had

Seizures of contraband, in combination with the intercepted calls and physical surveillance, illustrated the scope of SANTIAGO's network. For example, On June 6, 2004, SANTIAGO called codefendant Jose RODRIGUEZ and asked if he "still need[ed] 'the money'" and, when RODRIGUEZ answered affirmatively, SANTIAGO indicated that he was going to take "sixty (60) dollars" out of the bank. Shortly thereafter, surveillance units saw SANTIAGO drive the SANTIAGO minivan out of a small lot behind SANTIAGO'S 264 Mechanic Street residence to RODRIGUEZ's residence at 261 Aiken Avenue. After parking the minivan, SANTIAGO was seen seated in the vehicle bending and shifting from one side to another as if retrieving something from the van's interior. Approximately one minute later, surveillance agents saw SANTIAGO exit Santiago's minivan, appear to fold under and then pull the bottom of his shirt, and walk up the stairs to RODRIGUEZ's second-floor apartment. Shortly thereafter, SANTIAGO exited the residence, returned to the SANTIAGO minivan and drove it out of the area. Later, a surveillance officer saw RODRIGUEZ exit his apartment and walk from the rear of the premises out to Aiken Avenue, looking cautiously in all directions and with his right hand shoved deeply into the right pocket of his baggy running

---

negotiated the quantity and price for it with RIVERA; and REYES made four (December 18, January 7, January 14, January 30) of the five deliveries of heroin that the undercover agent ordered from RIVERA, who in turn had received heroin from SANTIAGO.

pants.  RODRIGUEZ saw and waved down a black BMW driven by a Hispanic male.  RODRIGUEZ entered the front passenger seat of the BMW, which then headed south on Aiken Avenue.  A marked cruiser then stopped the BMW.  During the pat-frisk of RODRIGUEZ, a clear plastic baggie (containing 1 10-gram "finger" of heroin) fell down the inside of RODRIGUEZ'S right leg and out the bottom of his pants.  The Lowell Police Department then obtained a state warrant to search RODRIGUEZ'S apartment.  An additional 50 grams of heroin were found inside RODRIGUEZ's residence (for a total of 60 grams, consistent with the earlier intercepted conversation).

    For another example, on August 26, 2004, during an intercepted telephone conversation, SANTIAGO asked codefendant Jose TORRADO "how many 'guys' are going to go up to the park?"  TORRADO said "only one right now but that on Saturday, maybe 4 or 5 want to go up."  In a later call, SANTIAGO instructed TORRADO to go to a specific location.  SANTIAGO told TORRADO "he'll find the coffee in a garbage bag in the garbage."  A few moments later, TORRADO spoke to SANTIAGO over the telephone and confirmed that he had "found a coffee one."  SANTIAGO asked if TORRADO "left the car papers there."  TORRADO responded affirmatively, and asked if there is 1 or 2.  SANTIAGO said TORRADO told him one (referred to earlier as a "guy").  While these intercepts were being made, agents followed SANTIAGO in his van to the area of Lowell where codefendant Edwin TORREZ lived.  He was seen by

surveillance agents getting out of the van and entering 427 Rosewood Lane (subsequently identified as the residence of codefendant Luis SANCHEZ, a/k/a PITO). Surveillance then observed TORRADO arrive at Rosewood Lane and park his vehicle next to the SANTIAGO's minivan. TORRADO then entered Santiago's minivan, remained inside for about 20 seconds, and exited carrying a white coffee cup. He returned to his vehicle where he remained for about 1 minute before departing the area. TORRADO's vehicle was followed by surveillance agents. It became apparent to the agents that TORRADO became aware of surveillance following him as his speed increased and he made several quick turns to evade them. TORRADO was stopped by a uniformed Lowell Police Department officer. While TORRADO was being questioned, Detective Figueroa of the Lowell Police Department observed RIVERA drive by TORRADO. A search of TORRADO and his vehicle were performed with negative results and TORRADO was released; however, Detective Figueroa retraced TORRADO'S route prior to being stopped and located a (white) McDonald's coffee cup which contained a hard cylinder object wrapped in gray duct tape further containing **one** finger of heroin (10 grams). TORRADO's latent fingerprint was later detected on the coffee cup.

### Santiago's Home Base Was His Residence at 264 Mechanic Street, Where Heroin and Firearms Were Found

Santiago often made drug deliveries to (or collected drug monies from) his customers at their residences. As surveillance

6

revealed, however, he was living at 264 Mechanic Street throughout the time that he was conducting his heroin distribution business and he would often leave his residence to deliver to drug customers and/or return to his residence after receiving drug monies from them or after having traveled to get a supply of heroin from his New York-based supplier.

For example, during an August 18, 2004 intercepted call, Santiago and co-defendant Carlos Sanchez agreed to meet that night. When Santiago asked Carlos Sanchez how much the "car part cost," Carlos Sanchez replied that "it's pretty cheap, $250.00." At approximately 9:30 p.m. that night, surveillance observed Santiago leaving his address at 264 Mechanic Street in the Santiago minivan. At approximately 9:45 p.m., surveillance observed Santiago parking the Santiago minivan in front of Sanchez's 270 Fairmont Street residence. Santiago exited his vehicle and was observed walking up the steps toward 270 Fairmont Street. About 30 minutes later, surveillance officers observed Santiago leaving the area of Carlos Sanchez's 270 Fairmont Street residence accompanied by a second Hispanic male. Santiago walked directly to his vehicle while the other Hispanic male looked in both directions up and down Fairmont Street. Based upon numerous previously intercepted conversations in which Santiago uses monetary amounts or car parts as code for quantities of heroin, the intercepted conversations and subsequent surveillance

indicated that Carlos Sanchez ordered 250 grams of heroin from Santiago and that Santiago then delivered the heroin to Carlos Sanchez.

For another example, in a series of intercepted conversations on July 1, 2004, co-defendant Enrique Agosto ("Agosto") ordered "sixty" (meaning sixty grams of heroin) and an additional "money order" for $16.00 (an additional 16 grams of heroin). The following day, July 2nd, Santiago told Agosto to get ready because Santiago was waiting for Agosto to go to the "beach." Santiago instructed Agosto to take the right amount of money for the "parking." Soon after this call, surveillance observed Santiago drive out of the driveway of 264 Mechanic Street in his minivan. Surveillance officers then followed Santiago directly to Lowell where Agosto lived.

Finally, before and after each of his trips to New York to his heroin supplier, Santiago left and then returned to his residence at 264 Mechanic Street. On September 15, 2004, Santiago received a telephone call from a telephone later determined to be used by co-defendant Juan Nunez, Santiago's heroin supplier. The following day, September 16, 2004, the GPS device on the Santiago minivan indicated that Santiago left his residence at approximately 9:57 p.m. and traveled to 930 59th Street in Brooklyn, New York, Nunez's residence. Although there was no physical surveillance conducted of this trip, the GPS

device indicated that the Santiago minivan stayed at Nunez's residence for approximately five hours before leaving at 2:53 a.m. and returning to 264 Mechanic Street at approximately 6:33 a.m.  Less than two weeks later, on September 27, 2004, the GPS device on the Santiago minivan revealed that Santiago left 264 Mechanic Street at approximately 10:20 a.m. and arrived at Nunez's residence at approximately 1:45 p.m.  Surveillance there observed Santiago arrive in the Santiago minivan and enter the 59th Street residence.  Surveillance at Nunez's residence observed Santiago and Nunez outside together.  The GPS device showed that Santiago's minivan left Nunez's residence at approximately 3:00 a.m. and arrived back at 264 Mechanic Street at approximately 6:35 a.m.

On October 13th, there was an intercepted call between Santiago and the caller (Nunez) from 718-598-5109.  Santiago told Nunez that he would visit "early in the weekend."  On October 14, 2004, the GPS device showed that the Santiago minivan drove from Massachusetts to New York.  Surveillance observed Santiago arrive in the Santiago minivan at Nunez's residence at 930 59th Street in Brooklyn, New York around 2:20 p.m.

When Santiago arrived, a male later identified as Nunez emerged from 930 59th Street carrying a small black plastic bag. Nunez went to the driver's side of SANTIAGO's minivan and handed the bag to Santiago.  After a short conversation, Nunez walked

9

over to another car, drove off and parked a short distance away. When Nunez returned, Nunez went to the passenger side of the Santiago minivan and opened the sliding door and took a garment bag out and took it into the residence. Santiago followed him inside the building at 930 59th Street at approximately 2:55 p.m. Santiago remained at this address until he left in the early morning hours on October 15, 2004. As summarized below, this trip was the last of Santiago's trips to New York to visit Nunez and culminated in Santiago's and Nunez's arrests and the seizure of ½ kilogram of heroin from Santiago's vehicle on October 15, 2004.

**The Arrest of Santiago and Others and Execution of Search Warrant at 264 Mechanic Street (Santiago's Residence) on October 15, 2004**

At approximately 2:20 a.m. on October 15, 2004, surveillance observed Santiago and Nunez exit the building at 930 59th Street in Brooklyn, NY where Nunez resided. Surveillance observed that Santiago was not carrying anything, but Nunez was carrying the same garment bag that Nunez had taken from the Santiago minivan when Santiago had arrived. Santiago went to driver's side of the Santiago minivan and got in. Nunez went to the passenger's side and opened the sliding door, put the garment bag inside and then shut the door. Nunez then got into the front passenger seat. The two men sat in the vehicle for approximately five minutes. To surveillance, it looked like they were manipulating something

in front seat area. Then, Nunez got out and went back into the building. Santiago drove away and surveillance agents followed. SANTIAGO's minivan headed east on the Brooklyn Queens Expressway and exited the highway at the Manhattan Bridge exit. Shortly thereafter, agents stopped the Santiago minivan and arrested Santiago. Santiago was carrying one of the target telephones in his pocket.

Pursuant to a search warrant, the agents then conducted a search of the Santiago minivan. The search uncovered approximately 500 grams of heroin wrapped in a black plastic bag inside a hidden compartment in the portion of the dashboard where the passenger-side airbag usually is located. Another target telephone was also found in this location.

Later in the morning of October 15, 2004, five federal search warrants were executed in Massachusetts. At 264 Mechanic Street (Santiago's residence), law enforcement agents seized items including but not limited to SANTIAGO's cellphone, seven fingers (or 70 grams) of heroin, a 9 mm firearm, three firearm silencers and various items relating to the processing and packaging of heroin including two, digital scales, a steel press, money counter, 2 steel finger press molds and grinder. The handgun, silencers and heroin were located above a ceiling tile in a common hallway just outside Santiago's apartment between his residence and one other apartment, which was vacant at the time.

ARGUMENT

Santiago asks that the Court sever Count One from Counts Seven and Eight.  His principal justification is twofold: (1) he desires to testify with respect to the gun counts, but not the drug charge; and (2) he makes general claims of possible spillover prejudice from the fact that he is the only defendant charged with gun and drug offenses in this case.

Rule 8(a) of the Federal Rules of Criminal Procedure permits the joinder of two or more offenses "if the offenses charged, . . . are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan."  The Rule is "generously construed in favor of joinder." United States v. Randazzo, 80 F.3d 623, 627 (1st Cir. 1996).  In order to convict Santiago under 18 U.S.C. § 924(c)(1)(A), the government must prove at trial (1) that he committed the underlying drug-trafficking crime, (2) that he knowingly possessed a firearm, and (3) that he did so in furtherance of the specified drug-trafficking crime.  See United States v. Flecha-Maldonado, 373 F.3d 170, 170 (1st Cir. 2004).  Joinder of the counts is proper in this case because the evidence establishing the heroin conspiracy charge (Count One) is the same evidence needed to establish the first element of the § 924(c) charge. Indeed, Count Seven specifically alleges that the defendant

possessed firearms in furtherance of the drug trafficking crime identified in "Count 1 of this indictment."

The charges are based upon the exact same criminal conduct, involve the same witnesses and the same evidence, and occur within the same time frame. Because Count Seven is joined-at-the-hip with Count One, they should not be severed. Count Eight, which charges simple possession of the same silencers referenced in Count Seven and seized from Santiago's residence (along with heroin), likewise should be considered by one fact finder in the interest of judicial economy.

In seeking severance, Santiago has the substantial burden to present facts demonstrating that a single proceeding would deny him a fair trial. See, e.g., United States v. Rawwad, 807 F.2d 294, 295 (1st Cir. 1985), quoting United States v. Porter, 764 F.2d 1, 12(1st Cir. 1985). Santiago's burden here is particularly heavy given the multi-party nature of this case and the existence of the conspiracy charge. E.g., United States v. Rose, 104 F.3d 1408, 1415 (1st Cir. 1997) (degree of prejudice that the defendant must show has to be greater than that inherent in trying multiple counts and multiple defendants together); United States v. Brandon, 17 F.3d 409, 440 (1st Cir. 1994) ("In the context of conspiracy, severance will rarely, if ever, be required").

It is well settled that severance motions made pursuant to

Fed. R. Crim. P. 14[3] are addressed to the sound discretion of the trial judge and that an appellate court will reverse this exercise of discretion "only upon a demonstration of manifest abuse." United States v. Boylan, 898 F.2d 230, 246 (1st Cir. 1990); see also United States v. Scivola, 766 F.2d 37, 41 (1st Cir. 1985). To prevail under Rule 14, the defendant must "make a strong showing of prejudice." Boylan, 898 F.2d at 246 (quoting United States v. Porter, 764 F.2d 1, 12 (1st Cir. 1985)). "In this context, 'prejudice means more than just a better chance of acquittal at a separate trial.'" United States v. Collazo-Aponte, 216 F.3d 163, 180 (1st Cir. 2000)(quoting United States v. Martinez, 479 F.2d 824, 828 (1st Cir. 1973)).[4] The First Circuit Court of Appeals has specifically noted:

> This is a difficult battle for the defendant to win. There is always some prejudice in any trial where more than one offense or offender are tried together – but "garden variety" prejudice, in and of itself, will not suffice. Even where large amounts of testimony are irrelevant to one defendant, or where a defendant's involvement in an overall agreement is far less than the involvement of others, we have

---

[3] Fed. R. Crim. P. 14(a) provides in pertinent part, "{i}f the joinder of offenses . . . in an indictment . . . appears to prejudice a defendant . . . the court may order separate trials of counts . . . or provide any relief that justice requires."

[4] In the event of convictions on all counts at a single trial, the defendant on appeal "must show that the joinder of offenses here resulted in 'actual prejudice,' which we define as the 'substantial and injurious effect or influence in determining the jury's verdict.'" United States v. Melendez, 301 F.3d 27, 36 (1st Cir. 2002)(quoting United States v. Lane, 474 U.S. 438, 449 (1986).

14

been reluctant to secondguess severance denials.
Boylan, 898 F.2d at 246 (citations omitted).

Against this backdrop, Santiago's contention that he is entitled to severance because of some generalized "spillover" effect from being the only defendant charged with a firearms offense simply must fail.  See generally United States v. Magana, 127 F.3d 1, 7 (1st Cir, 1997)(denial of severance upheld because evidence admissible against only one defendant is often admitted in joint trial); United States v. DeLeon, 187 F.3d 60, 64 (1st Cir. 1999)(denial of severance upheld because limiting instructions had jury consider charges and evidence against defendants individually).  Bottom line, the government necessarily would seek to admit the drug conspiracy evidence even if the defendant were tried separately on the firearm counts (Seven and Eight); and, the government would seek to admit the results of the search of Santiago's residence (including the discovery of the heroin, scales, and firearms) even if the defendant were tried separately on drug conspiracy count (One). In light of the broad discretion accorded trial courts in deciding severance motions, United States v. Olivo-Infante, 938 F.2d 1406, 1409 (1st Cir. 1991), considerations of judicial economy support trying all related counts against Santiago at one time.  See United States v. Alosa, 14 F.3d 693, 695 (1st Cir. 1994).

Similarly, Santiago's apparent desire to testify on some counts (the firearm counts) but not one other (the drug count) cannot justify severance. To be entitled to separate trials on this basis, the defendant has the burden of demonstrating the nature of testimony he wishes to give on one count and his reasons for not wishing to testify on the other in sufficient detail to permit the court to determine that the alleged prejudice is both real and substantial. E.g., United States v. Ballis, 28 F.3d 1399, 1408 (5th Cir. 1994)("it is essential that the defendant present enough information-regarding the nature of the testimony he wishes to give on one count and his reason for not wishing to testify on the other-to satisfy the court that the claim of prejudice is genuine and to enable it intelligently to weigh the considerations of 'economy and expedition in judicial administration" against the defendant's interest in having a free choice with respect to testifying'"). Accord, United States v. Reicheter, 647 F.2d 397, 401 (3rd Cir. 1981); United States v. Dicesare, 765 F.2d 890, 898 (9th Cir. 1985). Because the Court has been provided with nothing other than the bald assertion that the defendant wants to testify only with respect to Counts Seven and Eight only, this argument also provides no basis to sever.

United States v. Alosa, 14 F.3d 693 (1st Cir. 1994) is on all fours with the present case in critical respects. In Alosa, the defendant twice moved to sever a count charging him with the

16

use of firearms during and in relation to a drug trafficking crime from three underlying drug counts.  The Appeals Court upheld the trial court's denial of the severance motions, noting "while the courts zealously guard a defendant's Fifth Amendment right not to testify at all, the case law is less protective of a defendant's right to testify selectively, addressing some issues while withholding testimony on others that are related."  Id. at 695 (citations omitted).

The defendant in Alosa sought to testify in order to deny that the firearms were connected to drug trafficking.  Id.  While finding the basis for his severance motions "bland and conditional" and "sparse," the Court nevertheless relied on the suggestion that Alosa desired to testify that he was a "gun enthusiast" and that the handguns seized from his residence were collected "for fun."  Id.  While the defendant there (like here) never offered an explanation regarding his desire to refuse to testify about the drug counts, the Appeals Court nevertheless assumed the obvious: that the government had strong circumstantial evidence against him, but little direct evidence, and Alosa did not wish to further the prosecution's cause.  Id. Even assuming that the defendant had plainly stated his reasons for seeking severance at the outset, the Court concluded "we think that the denial of the severance still would have to be sustained."  Id.  Citing "obvious considerations of judicial

17

economy," the Court in <u>Alosa</u> concluded that denial of the severance motion was "assuredly" not an abuse of discretion. <u>Id</u>.[5]

Like <u>Alosa</u>, judicial economy here dictates that the counts against Santiago be tried together.  The defendant has failed to articulate a plausible basis in his motion that would justify severing counts for separate trials in the instant case.  Even assuming *arguendo* that Santiago wanted to deny possession of the firearms altogether (although they were found along with 70 grams of heroin) while seeking to avoid implicating himself in drug trafficking through his own testimony, severance should still be denied. <u>Id</u>. at 695.  To conduct a trial solely on Counts Seven and Eight at some date in the future only against Santiago would not be a proper use of judicial resources given the overlap in the evidence and the presence of multiple defendants in this case.

CONCLUSION

Based upon the foregoing, the United States respectfully

---

[5] The "second" motion to sever in <u>Alosa</u> was couched as a motion *in limine* seeking to preclude the government from cross-examining the defendant, if he elected to testify, about the underlying drug offenses.  The Court summarily rejected this argument, noting that the nature and scope of Alosa's drug distribution was proper grist for cross examination where the defendant was charged with use of a firearm in connection with that drug trafficking. <u>Id</u>. at 695-696.  The Court stated, "[t]he Fifth Amendment protects the defendants' right to choose to testify.  It does not assure that the testimony will only benefit the defendant." <u>Id</u>. At 696.  (citation omitted).

requests that the defendant's motion to sever be denied.

                                        Respectfully submitted,
                                        MICHAEL J. SULLIVAN
                                        United States Attorney


                                        By:  /s/William F. Bloomer
                                        WILLIAM F. BLOOMER
                                        Assistant U.S. Attorney
                                        BBO#553104
                                        william.bloomer@usdoj.gov
                                        (617) 748-3644


## CERTIFICATE OF SERVICE

    I, William F. Bloomer, hereby certify that this document filed through the ECF system on February 16, 2006, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non registered participants this date via US Postal Service, postage prepaid.



                                        /s/William F. Bloomer
                                          WILLIAM F. BLOOMER


Date: 16 February 2006