UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>    )<br>v.   )<br>    ) Criminal No. 04-10336-NMG<br>JULIO SANTIAGO )<br>    Defendant ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, Michael J. Sullivan, United States Attorney for the District of Massachusetts, and William F. Bloomer, Assistant U.S. Attorney, submits its Sentencing Memorandum with respect to Julio Santiago ("Santiago").[1]

**INTRODUCTION**

*Santiago was a the organizer and leader of a massive heroin distribution enterprise operating in the Lowell / Fitchburg areas. In just one four-month time span in 2004, he made seven confirmed trips to New York to obtain upwards of 500 kilograms of heroin per trip from his supplier, Juan Nunez. At the conclusion of the investigation on October 15, 2004, agents stopped Santiago on his return trip to Massachusetts after having met in New York with Nunez and discovered 493.3 grams of heroin hidden in a sophisticated trap inside his mini van. A search of Santiago's residence, including an attic directly above his apartment, yielded an additional 115.9 grams of heroin, two finger "presses," three scales, a money counter, a loaded 9 mm Lugar, three silencers, two additional clips, live ammunition, a spent casing, and money order and money wire transfer receipts. The evidence adduced at trial established that Santiago distributed 10-gram increments of heroin (called "fingers") to his codefendants after communicating with them over telephones and a pager. These co-conspirators in turn would sell the poison to their customers in the Greater Lowell area.*

---

[1] As this Court is aware, following a ten-day trial in October 2006, a jury returned guilty verdicts against five of the eleven codefendants in this case --SANTIAGO, Juan NUNEZ, Carlos COLON (a/k/a Pedro MIRANDA), Jose RODRIGUEZ, and Carlos SANCHEZ -- with respect to Count One of the Superseding Indictment. The jury also found Julio Santiago guilty of the firearms offenses set forth in Count Seven, namely, possession of firearms in furtherance of a drug trafficking crime, and possession of unregistered firearms, to wit: silencers, (Count Eight). The jury further found that the conspiracy as a whole was responsible for more than 1,000 grams of heroin. With the exception of Enrique AGOSTO, who was severed from his co-defendants for the purpose of trial, the remaining six codefendants have pleaded guilty.

To determine a defendant's final sentence, this Court must follow the three-step sentencing approach espoused by the First Circuit. United States v. Dixon, 449 F.3d 194, 204 (1st Cir. 2006); United States v. Jiménez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc); United States v. Robinson, 433 F.3d 31, 35 (1st Cir. 2005). First, this Court must calculate the advisory guideline range. E.g., United States v. Pho, 433 F.3d 53, 61 (1st Cir. 2006). Second, the Court must determine whether any traditional departures apply to the case at hand. E.g., United States v. Saez, 444 F.3d 15, 17 (1st Cir. 2006). Finally, the Court needs to determine whether any factors put forth in 18 U.S.C. § 3553(a) offer a persuasive reason to impose a sentence outside of the proposed guideline range. E.g., Robinson, 433 F.3d at 35.

## ANALYSIS

According to the Presentence Report (PSR), SANTIAGO is a Criminal History Category I. (PSR ¶¶ 155-156). Being responsible for between three and ten kilograms of heroin, his Base Level Offense is 34. (PSR ¶¶ 138-143). With a four-level adjustment under § 3B1.1 for being an organizer or leader of criminal activity involving five or more participants, Santiago's Total Offense Level is 38 and his GSR is 235 to 293 months. (PSR ¶¶ 145, 148, 191). He faces a statutory mandatory minimum of 15 years' imprisonment. (PSR ¶¶ 190-191).

The government recommends a period of 288 months' incarceration to be followed by a term of 5 years' supervised release. The government further recommends a fine in the amount of $500,000.00. Finally, for reasons set forth in its pleading entitled United States Motion for Judgment of Forfeiture, the government requests that the Court order forfeiture in the amount of $359,270.00, as part of the defendant's judgment and conviction.

    **A**    **Importance of the Guideline Range.**

Even though the guidelines are advisory, the First Circuit has ruled that the guidelines remain a central component of any sentencing post-Booker. Jiménez-Beltre, 440 F.3d at 518; see also United States v. Kandirakis, No. 04-10372-WGY, 2006 WL 2147610, at *10 (1st Cir. August 1, 2006) (stating "the Guidelines - and their judge-made factual findings - are still the driving force behind federal sentencing"). The First Circuit explained that the "guidelines remained 'an important consideration' because they represented the only 'integration of the multiple factors' identified in the statute, often reflected past practice, and bore the imprimatur of the [Sentencing Commission] expert agency charged with developing them." United States v. Smith, 445 F.3d 1, 4 (1st Cir. 2006), quoting Jiménez-Beltre, 440 F.3d at 518. The continuing importance of the guidelines is such that the more the judge's sentence differs from the advisory guideline range - either higher or lower - the more compelling the judge's justification must be for the atypical sentence. See Kandirakis, 2006 WL 2147610, at *11; United States v. Thurston, No. 05-2271, 2006 WL 2065404, at *4 (1st Cir. July 26, 2006); Smith, 445 F.3d at 4.

The importance of the final guideline range has nothing to do with the guidelines' former mandatory status, which was eliminated in Booker. Instead, reasonableness is judged in relation to the guidelines for three reasons adopted by the First Circuit in United States v. Jiménez-Beltre: (1) only the guidelines comprehensively examine the full panoply of sentencing considerations; (2) the guidelines represent decades of nationwide experience and study; and (3) they are the only measure for avoiding unwarranted sentencing disparities. See 440 F.3d at 518. Congress explicitly created the Sentencing Commission and guidelines to achieve these ends. Id.

The continued adherence to the now advisory guidelines remains evident in appellate

courts across the country. While courts have repeatedly reversed as unreasonable sentences outside the applicable guideline ranges,[2] reversals of sentences imposed within the guideline range have been extraordinarily rare. Kandirakis, 2006 WL 2147610, at *43 n.36; see also United States v. Cooper, 437 F.3d 324, 331 (3d Cir. 2006) ("[I]t is less likely that a within-guidelines sentence, as opposed to an outside-guidelines sentence, will be unreasonable"); United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005) ("[I]t will be rare for a reviewing court to say [a within-Guidelines sentence] is 'unreasonable.'"). Indeed, in the post-Booker era, only one within-guidelines sentence has been found blatantly unreasonable. United States v. Lazenby, 439 F.3d 928, 933 (8th Cir. 2006) (sentence based on comparison to co-defendant's sentence found unreasonable). Furthermore, just two additional sentences have been reversed where the appellate court determined that the district court judge failed to provide an adequate explanation of the within-guidelines sentence. United States v. Carty, 453 F.3d 1214 (9th Cir. 2006); United States v. Vonner, 452 F.3d 560 (6th Cir. 2006). Moreover, the First Circuit and its sister circuits have emphasized that the further outside the range, either above or below, a sentence falls, the stronger must be the justification for such disparate sentencing.

Here, the record – in the form of evidence introduced at trial and the reliable information set forth in the PSR – clearly supports the finding that Santiago was responsible for between three and ten kilograms of heroin (PSR ¶¶ 112, 138-143). See United States v. Panet-Collazo,

---

[2] See, e.g, Zapete-Garcia, 447 F.3d at 60 (holding that defendant's forty-eight month sentence – eight times the maximum of the advisory sentencing guideline range – was unreasonable as the district court failed to provide a reason for such a mammoth variance and neither defendant's prior deportations or arrest justified the increase); Smith, 445 F.3d at 5-6 (finding that defendant's forty-six month sentence – less than half the minimum advisory guideline range – for six counts of crack distribution and one count conspiring to sell narcotics was unreasonable as the defendant's minor role was taken into account in the guideline calculation and the defendant had previously sold narcotics near schools, violated post-arrest release terms, and had no better than usual rehabilitation prospects).

960 F.2d 256 (1st Cir. 1992) ("We review a trial court's findings of fact under the Sentencing Guidelines only for clear error"). According to GPS data and physical surveillance, Santiago made ten trips to Brooklyn and Elmhurst, New York between July and October 2004. (PSR ¶ 112). Probation conservatively estimated the amount of heroin attributable to Santiago by assigning 500 grams of heroin <u>only</u> for the trips to Brooklyn, New York (Juan Nunez's residence). (PSR ¶ 140). Probation further carefully extrapolated the amounts of heroin that Santiago distributed to his mid-level customers during this time period to arrive at 3,592.7 grams – specifically noting that the calculation did <u>not</u> include an additional 500 grams from Santiago's first trip to New York on July 25, 2004. It would not be clear error to find by a preponderance of the evidence that Santiago is responsible for between three and ten kilograms of heroin based on this record.

     Moreover, Santiago clearly was the organizer and leader of an organization that had at lease five participants or members who distributed massive amounts of heroin in less than one year's time. <u>See</u> 3B1.1(a); <u>United States v. Preakos</u>, 907 F.2d 7 (1st Cir. 1990) (District Court permitted to infer from undisputed facts in PSR that defendant exercised a high degree of decision-making authority in organizing a number of cocaine shipments from Florida to Maine, that Defendant ran a sophisticated drug operation out of his home, and that he exercised control over his four distributors); <u>United States v. Olivier-Diaz</u>, 13 F.3d 1 (1st Cir. 1993) (affirming District Court's enhancement of 4 levels under 3B1.1(a) as organizer or leader of criminal involving 5 or more participants or that was otherwise extensive, noting that "district court's views must be accorded 'considerable respect.'" quoting <u>United States v. Ocasio</u>, 914 F.2d 330, 333 (1st Cir. 1990)). The Sentencing Guideline commentary states in pertinent part:

5

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the requirement of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. U.S.S.G. § 3B1.1, comment., n.4.

The seven considerations listed in § 3B1.1, comment., n.4, while useful guideposts, are not exhaustive. United States v. Talladino, 38 F.3d 1255, 1260 (1st Cir. 1994).

"A defendant's role in the offense must be established by a preponderance of the evidence, ... and the sentencing court's factual findings are reviewed only for clear error." United States v. Tuesta-Toro, 29 F.3d 771,777 (1st Cir. 1994); see also United States v. Graciani, 61 F.3d 70, 75 (1st Cir. 1995) ("[T]he determination of a defendant's role in an offense is necessarily fact-specific. Appellate courts review such determinations only for clear error. ... Thus, absent a mistake of law, battles over a defendant's status and over the scope of the criminal enterprise will almost always be won or lost in the district court."). This aggravating role enhancement "is included primarily because of concerns about relative responsibility." § 3B1.1 comment. (backg'd). To invoke §3B1.1(a), the Court must determine (1) the status of the defendant (leader and/or organizer), and (2) the scope of the criminal activity (five or more participants). See United States v. Graciani, 61 F.3d 70, 75 (1st Cir. 1995).

Here, there is no question that Santiago at the very least was an "organizer," and quite possibly a "leader," of four participants in the crime in addition to himself. See United States v. Preakos, 907 F.2d 7, 10 (1st Cir. 1990) (court permitted to infer criminal activity involved five or more participants – defendant and his four distributors). In the seminal case of United States v. Tejeda-Beltran, 50 F.3d 105 (1st Cir. 1995) the First Circuit distinguished between the terms "organizer" and "leader" for purposes of § 3B1.1(a). There, the Appeals Court elaborated,

6

> "While the term 'leader' implies the exercise of some degree of dominance or power in a hierarchy, and also implies the authority to ensure that other persons will heed commands--by definition, one cannot lead if no one follows--the term 'organizer' has a different connotation. One may be classified as an organizer, though perhaps not as a leader, if he coordinates others so as to facilitate the commission of criminal activity. ... The key to determining whether a defendant qualifies as an organizer is not direct control but relative responsibility. ... When, as now, the organizer stages an extensive activity in such a way as to evince an increased degree of relative responsibility, the four-level enhancement applies whether or not he retains supervisory control over the other participants." Id. At 112.

The First Circuit reaffirmed this distinction recently in United States v. Picanso, 333 F.3d 21, 24-25 (1st Cir. 2003) (characterization of defendant as "organizer" "turns in some measure on an overall assessment of the defendant's role based on an assemblage of detail. . . . the trial judge has the advantage over [the appeals court] as to both the raw facts and the 'feel' of the situation.").

Here, the trial testimony and PSR attest, either directly or by fair inference, that Santiago orchestrated this entire conspiracy, made decisions about when and where heroin distribution would take place, played a pivotal role in bringing coconspirators together at coconspirators' residences to commit the crime, retained a degree of control over at least one participant, employed a sophisticated paging system that was utilized by several conspirators to communicate drug orders to him, engaged a network of counter surveillance to thwart police detection, and possessed sufficient authority and resources to establish a drug-distribution franchise at the request of an underling. Specific examples of the above are as follows,

**09/02/04:** After receiving heroin orders from Rodriguez (five fingers), Torrado (five fingers), and Torrez (2 fingers), Santiago called Miranda and said he wanted to go to Miranda's house to "fill out some papers." Santiago advised Miranda that it "may take sometime." Surveillance agents then observed Santiago arrive at Miranda's residence later that evening, followed by Rodriguez, Torrado, and Torrez, who came and left Miranda's residence. During this time

period, agents observed Miranda outside his residence repeatedly sweeping one area of his drive way while looking around in a manner consistent with counter surveillance. (PSR ¶¶ 87-94). At one point, a call was intercepted during which Miranda discussed the presence of vehicles in the area with Santiago, including an occupied Volkswagen bearing a New Hampshire license plate. Miranda asked Santiago if he (Santiago) wanted him (Miranda) to make the occupants of the vehicle leave, but Santiago instructed Miranda to "see who it is." (Trial Exhibit #53). At that time, agents observed Miranda approach a red Volkswagen Passat with New Hampshire license plates and speak to its occupants. (PSR ¶92);[3]

**08/26/04:** After receiving an order for 50 grams of heroin from Luis Sanchez as well as a heroin order from Torrado, Santiago drove to Sanchez's residence where he was seen getting out of the van and entering the dwelling with Sanchez. Sanchez clutched a shiny object in his hand which he had received from Santiago. (PSR ¶74) From inside Sanchez's residence, Santiago gave instructions over the phone to Torrado, who had just arrived, to retrieve heroin from inside his van. (PSR ¶75) After retrieving the heroin, Torrado returned to his vehicle, confirmed receipt of the heroin with Santiago, and departed the area. Torrado was stopped within minutes after engaging in counter surveillance by a uniformed Lowell Police Department officer. A coffee cup bearing Torrado's fingerprint and containing 10 grams of heroin was found abandoned along Torrado's route of flight. A Lowell detective observed co-defendant Reynaldo Rivera drive passed Torrado during the stop. Within minutes, Rivera, who was not seen with Santiago or Sanchez earlier, called Santiago and informed him that "there were problems in the car . . . it stalled." Rivera then warned Santiago to be careful not to end up on foot himself. After these calls, Santiago telephoned Miranda and informed him that the guy [Torrado] "started trying the brakes and got a scare . . . but I mean a big scare . . . because he ran into a fence . . . fortunately, he spilled all the brake fluid" -- a coded reference to Torrado's having discarded the heroin before the police could stop him. (PSR ¶¶ 77-79);

**08/27/04:** After avoiding arrest the previous evening, Torrado agreed to meet with Santiago at Miranda's residence to purchase more heroin. (PSR ¶ 81) Later that day, agents observed and photographed Santiago and Torrado meeting at Miranda's residence at 212 Wilder Street in Lowell. After the transaction, Santiago called Torrado and told him to be careful, and that he (Santiago) "had a tail on him when he left," and that "it" was still with him (meaning surveillance agents). Torrado told Santiago to be careful since they have been trying to catch him for a long time;

Later that day, Miranda called Santiago and solicited Santiago's assistance with "a candidate to set up a little garage for me, man." (Trial Exhibit #53) Miranda described how someone had

---

[3]This is not the only time Santiago and his coconspirators employed a "sweeper" to engage in counter surveillance while they conducted a drug transaction. On August 20, 2004, Santiago traveled to Edwin Torrez's storage facility in Lowell to deliver a package of heroin. (PSR ¶ 71). Santiago was videotaped arriving with a black pouch and meeting with Torrez and codefendant Luis Sanchez inside the storage facility while an unidentified male repeatedly swept an area outside the storage facility. The videotape was admitted in evidence at trial.

sent the police over to this person and his father, but that they want "to keep working . . . and they have a big clientele, man." The fair inference, as the government argued at trial, is that Miranda was requesting Santiago's assistance in establishing another drug distributorship or franchise. (PSR ¶ 82). Miranda also warned Santiago to be very careful about going over to an area of Lowell following the murder of two Puerto Rican individuals because there were "state police, under-covers and everything, they are in that little town";

That same day, Santiago told Miranda that he hade gone to Miranda's home and had "left some papers" in the room that Miranda was painting. Santiago told Miranda that he had done so, because police were around there ready to give Santiago a "ticket." [At the time, agents were performing physical surveillance of 212 Wilder Street in Lowell]. (PSR ¶ 83) Santiago also told Miranda that he had left Miranda's house on foot, and that the police had followed him. Santiago repeated that he left the "papers" in the closet behind the stereo, behind some shoes. Miranda replied that it was "no problem" because he was going there right away; and

**10/09/04:** Santiago employed a fairly elaborate paging system over which customers -- Agosto, Rodriguez, Carlos Sanchez, and Rivera -- could place heroin orders. (PSR ¶¶ 107-111). On October 9, 2004, Santiago told Agosto to put the phone number and the "time" (meaning the quantity of heroin he wanted to buy) on the "card" (meaning the Target Pager) and that they would meet later.[4] About thirty-five minutes later, the Santiago's pager received a page of "9369-100" which is the last four digits of a telephone number used by Agosto and refers to a 100-gram order of heroin. Later, Santiago's pager received a page of "978-397-0840-100" which referred to a phone number used by Rodriguez and a 100-gram order of heroin. Santiago tried to reach Agosto at various numbers including the number above, but to no avail. Then, Santiago called Rodriguez at 978-397-0840. In the course of conversation, Rodriguez agreed "when the guy has the luggage (meaning money for heroin) ready to call him (meaning Santiago)." Santiago further instructed Rodriguez to have him (Agosto) call him (meaning Santiago) as soon as possible. About one-half hour later, Santiago called the same number on which he previously talked to Rodriguez and talked to Agosto. Santiago asked Agosto what his problem was. Agosto said that he had the "suitcases" (meaning the money). Shortly thereafter, surveillance agents observed the Santiago minivan around the corner from Miranda's residence. Santiago again spoke with Agosto, who said that he was on his way there (meaning to meet Santiago at Miranda's residence). Surveillance observed Agosto arrive and walk down the street toward 212 Wilder Street.

      Viewed from any perspective, Santiago's status as organizer and/or leader of five or more participants in this massive distribution scheme is beyond serious challenge.

---

[4]Agosto is the same person who Santiago employed on June 30, 2004, to test the "carburetors and injectors," coded language for heroin. After testing the product, Agosto told Santiago that "the cakes were too delicious." (PSR ¶ 64). He was also the same person stopped on May 5, 2004, by the Lowell police and found to be in possession of 600 baggies of heroin. (PSR ¶ 49).

B.  **Application of the § 3553(a) Factors.**

In this case, no unusual circumstances exist which warrant an exception to the preference for guideline sentencing. Section 3553(a)(4) and (5) specifically direct the Court to consider the applicable guidelines, and Section 3553(a)(6) commands that the Court strive to avoid disparity in sentencing, which, as explained above, is best accomplished through faithful application of the guidelines. The other 3553(a) factors also point to this conclusion. While all § 3353(a) factors must be considered by this Court, "it is not required to address those factors, one by one, in some sort of rote incantation when explicating its sentencing decision." Dixon, 449 F.3d at 205; see also United States v. Navedo-Concepcion, 450 F.3d 54, 57-58 (1st Cir. 2006) (reasoning that in every decision the main factors contributing to the sentence must be identified by the sentencing court, but there is no "requirement for a lengthy or detailed recitation or one addressing every claim and counter-argument; rather, the reviewing court needs, and both parties deserve, a *specific* explanation and not just a reference to the evidence.").

Santiago reports no significant physical impairments aside from "stomach issues," for which he uses the common medication Protonix (PSR ¶¶172-174). He denied having any mental or emotional problems and does not feel the need for psychological assistance (PSR ¶175). Santiago does report using heroin on a daily basis and is willing to participate in substance abuse treatment. (PSR ¶ 176). Although he has limited education (PSR ¶177), he claims to have supported himself with "odd jobs" over the years. (PSR ¶¶ 178-182).

In short, the PSR reflects nothing unusual or extraordinary in Santiago's background to justify taking him outside of the heartland of cases already addressed by the Sentencing

Guidelines. C.f., <u>Koon v. United States</u>, 518 U.S. 81, 116 S.Ct. 2035, 2047 (1996) ("[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline").

Santiago chose to inject massive quantities of poison into the Greater Lowell community with the assistance of several underlings simply as a means to make money. The amount of pain, addiction, and crime that he has contributed to is incalculable. To reflect the seriousness of the offense, to promote respect for the law and provide just punishment, to afford adequate deterrence and to protect the public, nothing should steer him outside the federal sentencing guideline range. See <u>United States v. Thurston</u>, No. 05-2271 (1st Cir. July 26, 2006) (discussing Congressional goal of promoting national uniformity in sentencing).

C.  **Sentence**

The government recommends a term of 288 months' imprisonment with 5 years' supervised release and a $500,000 fine. In addition, for reasons set forth in its pleading entitled *United States Motion for Judgment of Forfeiture*, the government further requests that the Court order forfeiture in the amount of $359,270.00, as part of the defendant's judgment and conviction. In light of the massive quantity of heroin that the defendant is accountable for, his possession of a loaded 9 mm Luger firearm in furtherance of his drug trafficking, and his possession of unregistered silencers, the government's recommendation is reasonable, <u>United States v. Jiminenez-Beltre</u>, 440 F.3d 514, 518 (1st Cir. 2006)(en banc), and in accord with the overarching principles and policies expressed and incorporated in the Sentencing Guidelines.

                                                  RESPECTFULLY SUBMITTED
                                                  MICHAEL J. SULLIVAN
                                                  United States Attorney

          By:    */s/ William F. Bloomer*
                  WILLIAM BLOOMER
                  Assistant U.S. Attorney
                  BBO#553104
                  william.bloomer@usdoj.gov
                  (617) 748-3644

## CERTIFICATE OF SERVICE

I, William F. Bloomer, hereby certify that this document filed through the ECF system on March 12, 2007, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                  */s/William F. Bloomer*
                  WILLIAM F. BLOOMER

Date: 12 March 2007